IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RECEIVED&FILED
CLERK'S OFFICE

DEC - 7 2012

US DISTRICT COURT
SAN JUAN, PR

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff | 12-**922** (DRD) |
| v. | **INDICTMENT** |
| **[1] MARTIN THUNA,**<br>(Counts 1 to 58, 60 and 61) | **VIOLATIONS:** |
| **[2] WAYNE THUNA,**<br>(Counts 1 to 8) | **Conspiracy**<br>18 U.S.C. § 1349 |
| **[3] JARED THUNA,**<br>(Counts 18 to 27 and 47 to 58) | 18 U.S.C. § 371 |
| **[4] EUGENE SHIRLEY,**<br>(Counts 1 to 58) | **Mail Fraud**<br>18 U.S.C. § 1341 |
| **[5] PEDRO TORRES,**<br>(Counts 1 to 58) | **False Statements** |
| **[6] MIKHAIL ROZENBERG,**<br>(Counts 1 to 8, 59, and 61) | 18 U.S.C. § 1001 |
| **[7] LAWRENCE ROZENBERG,**<br>(Counts 1 to 8 and 61) | **Unlicensed Wholesale Distribution**<br>21 U.S.C. § 331(t) |
| **[8] EDWARD ROZENBERG,**<br>(Counts 1 to 8) | 21 U.S.C. § 353(e)(2)(A) |
| **[9]DIMITRY ASHBEL, a/k/a "David",**<br>(Counts 28 to 46) | **Perjury**<br>18 U.S.C. § 1623 |
| **[10] MIKHAIL KEMEL,**<br>(Counts 1 to 17) | **Money Laundering Conspiracy** |
| **[11] JOSEPH DALLAL,**<br>(Counts 9 to 17) | 18 U.S.C. § 1956(h) |
| **[12] OLEG FACTOR,**<br>(Counts 9 to 17) | |
| **[13] SVYATOSLAV SHERMAN,**<br>(Counts 1 to 8) | SIXTY ONE COUNTS AND<br>FORFEITURE ALLEGATIONS |
| **[14] RUSLAN MISCHINSKY,**<br>(Counts 28 to 46) | |
| **[15] MARAT SHAKHRAMANYAN,**<br>(Counts 28 to 46) | |
| **[16] SAMUEL ASHKENAZI,**<br>(Count 60) | |
| **[17] AVROHOM SEIDE,**<br>(Counts 47 to 58 and 60) | |
| **[18] MICHAEL WEISS,**<br>(Counts 47 to 58, 60) | |

1

**[19] JUDAH YABLONSKY,**
(Count 60)
**[20] AARON ROTTENSTEIN,**
(Count 60)
**[21] JACOB RICHTER,**
(Count 60)
**[22] ARARAT OVASAPYAN,**
(Count 61)
**[23] ERIC BAILEY,**
(Counts 18 to 27)
**[24] DROGUERIA DE LA VILLA, INC.,**
(Counts 1 to 58, 60 and 61)
**[25] LLC WHOLESALE SUPPLY, LLC,** and
(Counts 1 to 58, 60 and 61)
**[26] DROGUERIA VILLA, INC.,**
(Counts 1 to 58, 60 and 61)

Defendants.

THE GRAND JURY CHARGES:

At all times relevant to this indictment:

**INTRODUCTORY ALLEGATIONS**

1.     The wholesale distribution of prescription drugs in the United States is subject to regulation.   Regulating the wholesale market ensures that drugs dispensed to patients are authentic (i.e., not counterfeit), properly labeled, have been handled and maintained according to industry standards and Food and Drug Administration (FDA) requirements, that they have been in the possession of state-licensed entities, and have a verifiable chain of custody, also known as a pedigree.

2.     The FDA was an agency within the U.S. Department of Health and Human Services responsible for protecting the public health by assuring the safety, effectiveness, and security of human and veterinary drugs.

3.     Congress enacted the Prescription Drug Marketing Act in 1987 to combat a practice known as prescription drug diversion.  In essence, diverted pharmaceuticals are those that have been removed outside of the regulated distribution channels but then reintroduced into the wholesale marketplace through various means, including the falsification of the accompanying pedigrees. Once a pharmaceutical is diverted outside of the regulated distribution channels, it becomes difficult, if not impossible, for regulators or the end-users to know whether the pharmaceutical was altered, stored in improper conditions, or its potency adversely affected.

4.     In a practice known as street diversion, diverters repurchase dispensed medications from Medicaid patients, remove the patient labels, and reintroduce them into the wholesale market.  Another common form of diversion, using closed-door pharmacies, involves the unauthorized resale of drugs that manufacturers sell at steep discounts to non-profits like hospitals and healthcare entities.  Another form of diversion entails relabeling expired drugs with counterfeit labels so that they can be reintroduced into the wholesale market.

5.     The aim of prescription drug diversion is to acquire drugs at steep discount and reintroduce them into the wholesale market in a manner that obscures the fact that the drugs were ever diverted.  When done effectively, neither the pharmacist nor the consumer know that the diverted drugs are handled, packaged, and labeled by parties not authorized or qualified to do so.

6.     To prevent drug diversion, federal law requires, among other things, that wholesalers of prescription drugs be licensed by the state that they operate in.

7.     In addition, federal law generally requires wholesale distributors to provide what are commonly called pedigrees with each wholesale distribution of a prescription drug, and prohibits any alteration or modification of the same.  The pedigree lists all previous sales of that drug back to the last authorized distributor of record.  Requiring such an affirmative disclosure

3

discourages the introduction of drugs that come from illegitimate sources like unlicensed wholesalers, closed-door pharmacies, street diverters, and drug counterfeiters.    Separate and apart from the federal requirement, many states also required that wholesalers provide pedigrees with each wholesale distribution.

### INDIVIDUALS AND ENTITIES RELATED TO [24] DDLV, [25] LLC WHOLESALE AND [26] DROGUERIA VILLA

8.    Defendant, **[1] MARTIN THUNA**, owned and controlled various corporations involved in the distribution of diverted pharmaceuticals, including defendants, **[24] DROGUERIA DE LA VILLA (DDLV), [25] LLC WHOLESALE SUPPLY, LLC (LLC WHOLESALE)** and **[26] DROGUERIA VILLA, INC. (DROGUERIA VILLA).    [1] MARTIN THUNA** also owned or exercised control over FMC Distributors (FMC), FMC Specialty Care, Rayco International, and Flar Medicine, Inc.  In addition, **[1] MARTIN THUNA** had an interest in T.P. Investments.

9.    Defendant, **[24] DROGUERIA DE LA VILLA (DDLV)**, was a Puerto Rican corporation and held a pharmaceutical wholesale license in Puerto Rico.  **[24] DDLV** was a secondary wholesaler of prescription pharmaceuticals that serviced various regional chain and independent pharmacies throughout the continental United States. Its chairman was **[1] MARTIN THUNA** and the Chief Operating Officer/Executive Vice President was **[2] WAYNE THUNA**.

10.    Defendant, **[25] LLC WHOLESALE SUPPLY, LLC (LLC WHOLESALE)** was an Arizona limited liability company that held a pharmaceutical wholesale license in Arizona that also serviced various chain and independent pharmacies.  In 2009, after the State of California suspended **[24] DDLV**'s wholesale pharmaceutical license, **[1] MARTIN THUNA** formed a joint venture with **[25] LLC WHOLESALE** for the purpose of allowing **[24] DDLV**

4

to continue selling diverted pharmaceuticals into California. To circumvent the licensing requirement, **[24] DDLV** would receive diverted pharmaceuticals from suppliers in Puerto Rico and then ship the pharmaceuticals destined for California customers to **[25] LLC WHOLESALE** in Arizona. From there, the diverted pharmaceuticals would be shipped to customers in California and other locations. **[25] LLC WHOLESALE** was managed by **[3] JARED THUNA, [2] WAYNE THUNA**, and CC-1.

11.     Defendant, **[26] DROGUERIA VILLA, INC. (DROGUERIA VILLA)**, was a Tennessee corporation, controlled by **[1] MARTIN THUNA**, which operated as a sales center for **[24] DDLV**.

12.     FMC Distributors (FMC), FMC Specialty Care, Flar Medicine, Inc., Rayco International were Puerto Rican companies engaged in the sale and distribution of various pharmaceuticals and medical supplies. T.P. Investments, Inc. was engaged in the business of real estate investment. Throughout the relevant time alleged in the Indictment, **[1] MARTIN THUNA** would use these entities and their bank accounts to remit wire transfers and payments to facilitate the payment of **[24] DDLV**'s suppliers.

13.     Defendant, **[2] WAYNE THUNA**, was Chief Operation Officer/Executive Vice President of Compliance for **[24] DDLV** and for a period of time **[25] LLC WHOLESALE**. **[2] WAYNE THUNA** was also Secretary and Treasurer of FMC Distributors and Secretary of Flar Medicine, Inc. Among other duties, **[2] WAYNE THUNA** was personally responsible for quality control and regulatory compliance.

14.     Defendant, **[3] JARED THUNA**, was a Compliance Officer for **[24] DDLV** in its regulatory department and was a manager of **[25] LLC WHOLESALE**.

15.     Defendant **[4] EUGENE SHIRLEY**, was Vice President of Sales and Purchasing for **[24] DDLV** and for a period of time **[25] LLC WHOLESALE**. **[4] EUGENE SHIRLEY**'s responsibilities included identifying sources of diverted pharmaceuticals for **[24] DDLV** and **[25] LLC WHOLESALE**.

16.     Defendant, **[5] PEDRO TORRES**, was the warehouse manager for **[24] DDLV** and reported directly to **[1] MARTIN THUNA**. **[5] PEDRO TORRES**'s duties included overseeing the receipt and inspection of pharmaceuticals purchased by **[24] DDLV**.

17.     CC-1 worked with **[1] MARTIN THUNA** at **[25] LLC WHOLESALE**. Among his responsibilities included obtaining new sources of diverted pharmaceuticals and customers.

### [24] DDLV, [25] LLC WHOLESALE AND [26] DROGUERIA VILLA'S BUSINESS

18.     From approximately in or around January 2007 continuing through in or around January 2011, by knowingly acquiring approximately four hundred and forty million ($440,000,000) of diverted pharmaceuticals, **[24] DDLV**, **[25] LLC WHOLESALE** and **[26] DROGUERIA VILLA,** were able to offer better pricing to chain and independent pharmacies in the Continental United States than competitors while maintaining the appearance of compliance with applicable regulations.

19.     In order to provide the appearance of compliance with applicable regulations, **[1] MARTIN THUNA** required all suppliers to **[24] DDLV**, **[25] LLC WHOLESALE** and **[26] DROGUERIA VILLA** to be licensed in a state and provide a pedigree which falsely indicated that the supplier had purchased the pharmaceuticals directly from authorized distributors, when in fact, the pharmaceuticals originated from closed door pharmacies, had previously been dispensed, or originated from unknown sources that were not the authorized distributors listed on the pedigrees.

20.     Notwithstanding the requirement that suppliers would comply with the documentation requirements, **[24] DDLV**, **[25] LLC WHOLESALE**, **[26] DROGUERIA VILLA**, **[1] MARTIN THUNA**, **[2] WAYNE THUNA**, **[3] JARED THUNA**, **[4] EUGENE SHIRLEY**, and **[5] PEDRO TORRES** knew that the pharmaceuticals purchased by **[24] DDLV** and **[25] LLC WHOLESALE** for sale to chain and independent pharmacies originated from sources other than the authorized distributors listed on the pedigrees.

21.     To prevent damaged drugs from reaching customers and provoking scrutiny or jeopardizing a customer account, **[24] DDLV**, **[25] LLC WHOLESALE**, **[1] MARTIN THUNA** and **[5] PEDRO TORRES** instituted an inspection process to identify damaged drugs, including bottles that contained the incorrect dosage or pharmaceutical.  If the pharmaceuticals did not pass the inspection process, they were not received into inventory and returned to the supplier. However, this inspection process sometimes failed to identify pharmaceuticals with counterfeit labels, incorrect dosage amounts, incorrect lot numbers, incorrect medicines, patient pharmacy labels, chemicals used to remove patient labels (that in some cases had seeped through the bottles and contaminated the pills), and modified expiration dates.

22.     The suppliers set forth below provided **[24] DDLV** and **[25] LLC WHOLESALE** with products substantially below the Wholesale Acquisition Cost (WAC) of the pharmaceuticals, the standardized prices established by manufacturers.   While modest discounting off WAC was not uncommon (and occasionally manufacturers and ADs offered closeout pricing on specific drugs), **[24] DDLV**, **[25] LLC WHOLESALE** and **[26] DROGUERIA VILLA** consistently purchased drugs at prices ranging from 10 to 40 percent below WAC, thereby allowing them to undercut the competition and resell the pharmaceuticals at substantial profit.

7

23.     As a result, pharmacies that bought from **[24] DDLV, [25] LLC WHOLESALE,** and **[26] DROGUERIA VILLA,** did not receive what they paid for.  They paid for FDA-approved prescription drugs that had remained in the legitimate distribution channels designed to ensure the drugs were authentic, properly handled, and in compliance with all statutory and regulatory requirements.  Instead, pharmacies received drugs of unknown quality and origin whose false pedigrees made it practically impossible to trace or determine the true source of the pharmaceuticals they were receiving.

24.     Patients, likewise, did not receive what they paid for.  Patients rightfully expected that the drugs they receive comply with all applicable laws, including laws intended to ensure they remained in the regulated distribution channels intended to protect patients from misbranded, adulterated, sub-potent, improperly handled, and counterfeit pharmaceuticals.

25.     **[24] DDLV** and **[25] LLC WHOLESALE** acquired diverted pharmaceuticals through a network of suppliers located primarily in California and New York, more fully described below.  Once the pharmaceuticals arrived at **[24] DDLV** in Puerto Rico and **[25] LLC WHOLESALE** in Arizona, they would be sold and shipped to customer chain and independent pharmacies throughout the continental United States.

### [24] DDLV, [25] LLC WHOLESALE and [26] DROGUERIA VILLA'S SUPPLIERS OF PHARMACEUTICALS

26.     California Pharmaceutical Specialist (CPS), Infinite Health Wholesale (Infinite), and Global Health Advocates (Global) (collectively referred to as the "ROZENBERG GROUP"), were operated by defendant **[6] MIKHAIL ROZENBERG** and his two sons, defendants **[7] LAWRENCE ROZENBERG** and **[8] EDWARD ROZENBERG.**  Other individuals associated with the ROZENBERG GROUP were defendants **[10] MIKHAIL KEMEL** (Global and CPS), **[13] SVYATSLAV SHERMAN** (Infinite), **[22] ARARAT**

**OVASAPYAN**, and others known and unknown to the Grand Jury. Throughout the period of this Indictment, CPS had a license in California for a period of time that was then changed to New Hampshire, Infinite was licensed in New Hampshire, and Global was licensed in Pennsylvania. Notwithstanding their licenses in various states, all these entities operated out of California. Pedigrees from these companies falsely stated that CPS, Infinite, and Global purchased all their pharmaceuticals from McKesson. During the period covered by this indictment, the ROZENBERG GROUP supplied **[24] DDLV** and **[25] LLC WHOLESALE** with approximately $69 million of diverted pharmaceuticals.

27.     RTL Health Source, Corp. (RTL), was owned and operated by CC-2. The company was licensed as a wholesaler in Hawaii and maintained a Hawaii business address but conducted business and shipped the pharmaceuticals without a license from an office in Anaheim, California. The pedigrees associated with the pharmaceutical shipments to **[24] DDLV** falsely stated that RTL purchased all of the pharmaceuticals directly from authorized distributors, including H.D. Smith, McKesson, and AmerisourceBergen. However, RTL actually purchased pharmaceuticals from codefendants **[10] MIKHAIL KEMEL**, **[11] JOSEPH DALLAL**, **[12] OLEG FACTOR**, and CC-3. These individuals who supplied RTL obtained their pharmaceuticals from unknown sources. During the period covered by this indictment, the RTL group was responsible for supplying approximately $91 million of diverted pharmaceuticals to **[24] DDLV** and **[25] LLC WHOLESALE**.

28.     EMED Medical Products (EMED) was operated by CC-4. EMED held a Missouri wholesale license and maintained a business address in St. Louis, Missouri, but CC-4 appropriated the EMED license and name in Missouri to open up bank accounts and distribute pharmaceuticals without a license from CC-4's office in Los Angeles, California. EMED

pedigrees falsely stated that its pharmaceuticals originated from McKesson, AmerisourceBergen, H.D. Smith, and Cardinal Health. However, EMED's pharmaceuticals came from the ROZENBERG GROUP, and other individuals who obtained their pharmaceuticals from unknown sources. Another individual associated with EMED included **[23] ERIC BAILEY**, who, upon learning that EMED's license and name had been appropriated, facilitated the transfer of funds received in Missouri from **[24] DDLV** to California. During the period covered by this indictment, the EMED group was responsible for supplying **[24] DDLV** and **[25] LLC WHOLESALE** with approximately $21 million of diverted pharmaceuticals.

29. BowxRx, Inc. (BowxRx), and Oahu Rx, Inc. (Oahu) (hereafter BOWX GROUP) were operated by defendants **[9] DIMITRY ASHBEL**, **[14] RUSLAN MISCHINSKY**, and **[15] MARAT SHAKHRAMANYAN**. BowxRx held a wholesale license in New Hampshire and Oahu Rx held a wholesale license in Hawaii, but both companies shipped pharmaceuticals from a UPS Store in California. The pedigrees from the BOWX GROUP falsely stated that they acquired their pharmaceuticals directly from AmerisourceBergen, however, the pharmaceuticals actually came from individuals known and unknown to the Grand Jury. During the period covered by this indictment, the BOWX GROUP supplied **[24] DDLV** and **[25] LLC WHOLESALE** with approximately $34 million in diverted pharmaceuticals.

30. Arbudol Corp. (Arbudol), Columbus Wholesale, Inc. (Columbus) and Cimax Corp. (Cimax) (collectively referred to as the "ARBUDOL GROUP") were operated by individuals known and unknown to the Grand Jury. Though these businesses maintained drug wholesale licenses and business addresses in Maryland and Pennsylvania, they shipped pharmaceuticals without a license from UPS stores in New York City, New York. Pedigrees from the ARBUDOL GROUP falsely stated that they had acquired pharmaceuticals from

AmerisourceBergen, however, the drugs were acquired from unknown sources. During the period covered by this indictment, the ARBUDOL GROUP supplied **[24] DDLV** and **[25] LLC WHOLESALE** with approximately $169 million in diverted pharmaceuticals.

## COUNT 1 (ROZENBERG GROUP)
### Conspiracy
### Mail & Wire Fraud
### 18 U.S.C. §1349

31.     Paragraphs 1 through 25 and paragraph 26 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

32.     Beginning on or about January 2007 and continuing through about January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[2] WAYNE THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[6] MIKHAIL ROZENBERG,**
**[7] LAWRENCE ROZENBERG,**
**[8]EDWARD ROZENBERG,**
**[10] MIKHAIL KEMEL,**
**[13] SVYATOSLAV SHERMAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE,** and
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury to:

a.     Use private and commercial interstate carriers for the purpose of executing a scheme and artifice to defraud, and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341; and

11

b.      Use interstate wires in furtherance of a scheme to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

### OBJECT OF THE CONSPIRACY

33.     The object of the conspiracy was to use mails and wires to execute a scheme in which drugs of unknown origin were obtained from Infinite, Global and CPS in the diversion market, fraudulently reintroduced into the wholesale market through **[24] DDLV, [25] LLC WHOLESALE,** and **[26] DROGUERIA VILLA,** and sold under false pretenses to pharmacies and end users.

### MANNER AND MEANS

34.     The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

35.     Sometime in 2007, **[4] EUGENE SHIRLEY,** acting on behalf of **[24] DDLV** and **[25] LLC WHOLESALE,** and CC-5, established a business relationship with **[6] MIKHAIL ROZENBERG** for the purpose of supplying diverted pharmaceuticals to **[24] DDLV** and **[25] LLC WHOLESALE.** These pharmaceuticals would be shipped from various Fed Ex locations in the Los Angeles area to **[24] DDLV** in Puerto Rico and **[25] LLC WHOLESALE** in Arizona.

36.     **[6] MIKHAIL ROZENBERG** provided **[24] DDLV** with wholesale licenses showing that CPS was licensed in California, and then later New Hampshire, Infinite was licensed in New Hampshire, and Global was licensed in Pennsylvania. However, it was known to **[1] MARTIN THUNA, [2] WAYNE THUNA, [4] EUGENE SHIRLEY,** and **[5] PEDRO TORRES** that these companies operated exclusively from California.

37.     To obscure his involvement in the enterprise, **[6] MIKHAIL ROZENBERG** used **[6] MIKHAIL KEMEL's** and **[13] SVYATOSLAV SHERMAN's** names on licenses, pedigrees, vendor applications, and bank accounts.

38.     Once **[1] MARTIN THUNA** approved CPS, Infinite, and Global as suppliers, the ROZENBERG GROUP would acquire pharmaceuticals from unknown sources for sale to **[24] DDLV** and **[25] LLC WHOLESALE**.   **[6] MIKHAIL ROZENBERG** would sort the pharmaceuticals at various locations, including his house.   Sorting involved removing pharmaceuticals that were damaged, expired, or otherwise undesirable.

39.     Once drugs were selected for distribution, **[6] MIKHAIL ROZENBERG,** and individuals working at his direction, would ship pharmaceuticals to **[24] DDLV** and **[25] LLC WHOLESALE** from FedEx stores in the Los Angeles area.

40.     **[6] MIKHAIL ROZENBERG,** **[7] LAWRENCE ROZENBERG,** and individuals working at their direction would prepare an invoice that would be shipped with the drugs or faxed separately.

41.     **[6] MIKHAIL ROZENBERG** and others working at his direction would prepare a false pedigree for sales to **[24] DDLV** and **[25] LLC WHOLESALE**.  The pedigree would falsely state that the ROZENBERG GROUP had acquired the drugs from authorized distributors such as McKesson.

42.     Once the pharmaceuticals arrived at **[24] DDLV** in Puerto Rico, **[5] PEDRO TORRES** would remove damaged, expired, and other pharmaceutical products that customers might report to authorities or return to **[24] DDLV**.  Drugs that failed inspection were listed on discrepancy reports and returned to the ROZENBERG GROUP via UPS and FedEx to various California addresses.  Drugs that passed inspection at **[24] DDLV** were placed in inventory and

eventually sold to **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA** customers under the false pretenses.

43.     **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA**, through **[1] MARTIN THUNA** and **[4] EUGENE SHIRLEY**, would use the mails and wires to communicate with **[6] MIKHAIL ROZENBERG** in California.

OVERT ACTS

44.     In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the coconspirators committed and caused to be committed, in the District of Puerto Rico, and elsewhere, at least one of the following overt acts, among others.

45.     Sometime in the beginning of 2007, **[5] EUGENE SHIRLEY** asked an acquaintance, CC-5, to contact **[6] MIKHAIL ROZENBERG**.

46.     On or about March 20, 2007, an alternate source application and indemnity agreement for CPS was signed by **[10] MIKHAIL KEMEL** and submitted to **[24] DDLV**. The application falsely indicated that **[10]MIKHAIL KEMEL** was the controlling shareholder of CPS, indemnified FMC Distributors against any losses, and falsely represented that all the pedigrees contained true information.

47.     On or about March 29, 2007, **[24] DDLV** received a shipment from CPS under invoice number 1274 in the amount of $198,678.82.  The shipments contained prescription pharmaceuticals Zyprexa, Risperdal, Reyataz, Truvada, among others, and were sent using the UPS account number of Rayco International, a company controlled by **[1] MARTIN THUNA**. The associated pedigree for this shipment falsely indicated the drugs were purchased by CPS

from McKesson on March 12, 2007, when in fact CPS had not purchased the drugs from McKesson.

48.     On or about April 10th, 2007, **[5] EUGENE SHIRLEY** met with **[6] MIKHAIL ROZENBERG** and completed a wholesale/chain drug inspection form on behalf of **[24] DDLV** for a mock site inspection and falsely indicated that CPS maintained adequate records and adequate storage facilities required for the wholesale distribution of prescription pharmaceuticals, when in fact, no such adequate storage facilities existed or records were maintained.

49.     Sometime after April 2007, **[24] DDLV** was informed of CPS's new return address of 9835 San Fernando Road, Pacoima, CA 91331, the same address of Prestige Auto Salvage, a company owned and operated by **[6] MIKHAIL ROZENBERG, [7] LAWRENCE ROZENBERG**, and **[8] EDWARD ROZENBERG**.

50.     On or about December 18, 2007, a letter to CPS was placed in the CPS vendor file from **[3] JARED THUNA** requesting pedigree authentication for Cardinal, AmerisourceBergen, and McKesson.  Notwithstanding the fact that no verification was ever provided, **[24] DDLV** continued to purchase pharmaceuticals from CPS.

51.     On or about March 13, 2008, with its California license set to expire in December 2008, CPS obtained a license in the State of New Hampshire with an address in Nashua, NH. Notwithstanding the fact that CPS had obtained its license in New Hampshire, it continued to do business with **[24] DDLV** from California.

52.     On or about July 24, 2008, the name Infinite Wholesale was incorporated with the New Hampshire Secretary of State, listing the principal's address as 357 S. Fairfax Ave, Suite 245, Los Angeles, California.

53.     From on or about December 9, 2008 through December 23, 2008, **[24] DDLV** received 18 shipments of pharmaceuticals from CPS showing the Nashua, New Hampshire address on its invoices.  Notwithstanding the invoice address and fact that CPS was no longer licensed in California, all of the 18 shipments originated from a Federal Express facility at 7630 West Sunset Blvd., Los Angeles, California.  All of the invoices associated with these shipments were sent from Prestige Auto, located in Los Angeles, California, a company owned by **[6] MIKHAIL ROZENBERG**.

54.     On or about December 19, 2008, **[13] SVYATOSLAV SHERMAN** representing Infinite as its president, informed the New Hampshire Board of Pharmacy and **[24] DDLV** that CPS had changed its name to Infinite Wholesale, effective October 24, 2008.

55.     On or about December 24, 2008, **[1] MARTIN THUNA**, initiated a wire transfer from FMC Distributors, Inc., Citibank account number ending in 7567, located in Las Vegas, Nevada, to Infinite Health Wholesale, Union Bank account number ending in 9487, located in Los Angeles, California, in the amount of $150,000.00, as an advance on invoice 1387.

56.     Between January 9, 2009 and March 10, 2010, Infinite shipped approximately 414 boxes containing diverted pharmaceuticals to **[24] DDLV**, including Abilify, Aciphex, Actos, Advair, Aricept, Avandia, Celebrex, Combivir, Cymbalta, Effexor, Lexapro, Lidoderm, Lipitor, Nexium, Nasonex, Plavix, Prevacid, Seroquel, Singulair, Truvada, Valtrex, Viagra, Vytorin and Zyprexa, with each shipment originating at various Federal Express facilities in Los Angeles,

California.   Contrary to the representations stated in the pedigrees, some signed by **[13] SVYATOSLAV SHERMAN**, none of the pharmaceuticals were acquired from McKesson. Accompanying the pedigrees were invoices, some that were sent from Prestige Auto, a company owned by **[6] MIKHAIL ROZENBERG**.

57.     On or about June 8, 2009, Infinite sent diverted pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico under invoice number 1416.  The total sales price to **[24] DDLV** was $476,241.15.  The pedigree corresponding to invoice 1416 falsely stated that Infinite acquired the pharmaceuticals from McKesson.

58.     On or about June 25, 2009, **[5] PEDRO TORRES** prepared and caused to be prepared a discrepancy report for Infinite invoice 1416.  The report noted that the shipment included drugs were damaged, expired, and had broken seals.

59.     On or about June 8, 2009, Infinite sent pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico under invoice number 1416b.  The total sales price to **[24] DDLV** was $123,621.19.  The pedigree corresponding to invoice 1416b falsely stated that Infinite acquired the pharmaceuticals from McKesson.

60.     On or about June 25, 2009, **[5] PEDRO TORRES** prepared and caused to be prepared a discrepancy report for Infinite invoice 1416b.  The report noted that the shipment included drugs that were expired, damaged, and had a broken seal.

61.     On or about June 8, 2009, Infinite sent pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico under invoice number 1420.  The total sales price to **[24] DDLV** was $475,631.63.  The pedigree corresponding to invoice 1420 falsely stated that Infinite acquired the drugs from McKesson.

17

62. On or about July 2, 2009, **[5] PEDRO TORRES** prepared and caused to be prepared a discrepancy report for Infinite invoice 1420. The report noted that the shipment included a physician's sample of Advair, bottles of Coreg and Aciphex with broken seals, and other drugs with damage.

63. On or around January 27, 2010, Infinite sent diverted pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico including Nasonex, Advair, Abilify, Actos, Aricept, Cymbalta, Flomax, Lipitor, Zyprexa, with an invoice totaling $841,092.97. The pedigree corresponding to these pharmaceuticals falsely stated that Infinite had acquired these drugs from McKesson. In addition to containing problems with the accompanying pedigree, known by **[2] WAYNE THUNA** and **[24] DDLV**, the shipment contained a sample of Nasonex, which cannot be sold. Notwithstanding these and other problems, the defective products were returned and the remainder of the shipment coming from unknown sources was accepted by **[24] DDLV**, paid for, and distributed to pharmacies and consumers.

64. On or around February 2010, **[6] MIKHAIL ROZENBERG** phased out using the name Infinite and commenced operating as Global Health Advocates. Although Global Health Advocates was licensed only in Philadelphia, Pennsylvania, it continued to operate exclusively from Los Angeles, California. On or about February 23, 2010, a copy of Global Health Advocates' license was faxed to **[24] DDLV** from Sunset Auto Crafters, a company owned by **[6] MIKHAIL ROZENBERG**.

65. Between February 8, 2010 and January 25, 2011, Global Health Advocates shipped approximately 245 boxes containing diverted pharmaceuticals to **[24] DDLV** and **[25] LLC WHOLESALE** including Abilify, Aciphex, Actos, Advair, Aricept, Avandia, Celebrex,

Combivir, Cymbalta, Effexor, Lexapro, Lidoderm, Lipitor, Nexium, Nasonex, Plavix, Prevacid, Seroquel, Singulair, Truvada, Valtrex, Viagra, Vytorin and Zyprexa, with each shipment originating at various Federal Express facilities in Los Angeles, California.   Contrary to the representations listed in the pedigrees, none of the drugs came from McKesson.

66.     On or about April 12, 2010, Global sent diverted pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico under invoice number 1460.  The total sales price to **[24] DDLV** was $1,137,605.80.  The pedigree corresponding to invoice 1460 falsely stated that Global had acquired the pharmaceuticals from McKesson.

67.     On or about April 20, 2010, **[5] PEDRO TORRES** prepared and/or caused to be prepared a discrepancy report for invoice 1460.  The report noted that the shipment included 10 bottles of pharmaceuticals that were damaged, as well as 63 bottles which bore lot numbers of pharmaceuticals stolen from an Eli Lilly warehouse in February 2010.

68.     On or about June 6, 2010, Global sent pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico under invoice number 1468.  The total sales price to **[24] DDLV** was $1,101,383.09.   The pedigree corresponding to invoice 1468 falsely stated that Global purchased the pharmaceuticals from McKesson.

69.     On or about June 16, 2010, **[5] PEDRO TORRES** prepared and/or caused to be prepared a discrepancy report for invoice 1468.  The report noted that the shipment included 58 bottles of pharmaceuticals that were damaged, as well as 6 bottles that bore lot numbers of pharmaceuticals stolen from an Eli Lilly warehouse in February 2010.

70.     On or about September 23, 2010, **[4] EUGENE SHIRLEY** informed **[1] MARTIN THUNA** through a computer chat that there was "another bad bottle of abilify 30- also from Fat Mike", known within **[24] DDLV** and **[25] LLC WHOLESALE** as **[6]**

**MIKHAIL ROZENBERG**. Notwithstanding the continued problems with the quality of products coming from the ROZENBERG GROUP, **[24] DDLV** and **[25] LLC WHOLESALE** continued to purchase pharmaceuticals from the ROZENBERG GROUP.

71.     On or about October 18, 2010, Global sent or caused to be sent pharmaceuticals from a FedEx store in Los Angeles to **[24] DDLV** in Puerto Rico under invoice number 1481. The total sales price to **[24] DDLV** was $1,857,901.75. The pedigree corresponding to invoice 1481 falsely stated that Global purchased the pharmaceuticals from McKesson.

72.     On or about October 28, 2010, **[5] PEDRO TORRES** prepared and/or caused to be prepared a Discrepancy Report for Global invoice 1481. The report noted that the shipment included 63 bottles of pharmaceuticals that were damaged.

<u>**Count 2 (ROZENBERG GROUP)**</u>
**Conspiracy**
**False Statements and Unlicensed Wholesale Distribution**
**18 U.S.C. § 371**

73.     Paragraphs 1 through 25 and paragraph 26 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

74.     From in or around January 2007 through in or around January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[2] WAYNE THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[6] MIKHAIL ROZENBERG,**
**[7] LAWRENCE ROZENBERG,**
**[8]EDWARD ROZENBERG,**
**[10] MIKHAIL KEMEL,**
**[13] SVYATOSLAV SHERMAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

20

defendants herein, did willfully, that is, with the intent to further the conspiracy's unlawful objects, and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to:

a.      To violate Title 18, United States Code, Section 1001, by knowingly and willfully making and using a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States; and

b.      To violate Title 21 United States Code, Sections 331(t), 353(e)(2)(A), and 333(b)(1)(D) by knowingly engaging, and causing other to engage, in the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state.

OBJECT OF THE CONSPIRACY

75.      It was the object of the conspiracy to purchase, and to cause others to purchase, diverted pharmaceuticals from unlicensed sources in California and elsewhere, and for Global, Infinite and CPS to distribute those drugs without a license to **[24] DDLV** and **[25] LLC WHOLESALE**, and to falsify pedigrees associated with those pharmaceuticals.

MANNER AND MEANS

76.      The manner and means described in Count 1 of this indictment is incorporated by reference and re-alleged here as the manner means of the conspiracy described in this count.

OVERT ACTS

77.      The overt acts described in Count 1 of this indictment are incorporated by reference and re-alleged as overt acts in the conspiracy described in this count.

21

### Counts 3 through 8 (ROZENBERG GROUP)
### Mail fraud
### 18 U.S.C. §1341

78.     Paragraphs 1 through 26 and the manner and means alleged in Count 1 of the

Indictment are re-alleged and incorporated by reference as though fully set forth herein.

79.     On or about the dates set forth below, each date constituting a separate count of

the Indictment, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[2] WAYNE THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[6] MIKHAIL ROZENBERG,**
**[7] LAWRENCE ROZENBERG,**
**[8]EDWARD ROZENBERG,**
**[10] MIKHAIL KEMEL,**
**[13] SVYATOSLAV SHERMAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, along with other individuals known and unknown to the Grand Jury, aiding

and abetting one another, having devised a scheme and artifice to defraud, and to obtain money

and property by means of materially false pretenses and representations, did, for the purpose of

executing and attempting to execute such scheme and artifice, cause to be deposited with, and to

be sent by, private and commercial interstate carriers, and knowingly caused to be delivered by

such carriers according to the direction thereon, the following drug shipments:

MAILINGS FROM SUPPLIERS TO [24] DDLV and [25] LLC WHOLESALE

| COUNT | APPROX. DATE OF MAILING | INVOICE NUMBER | SUPPLIER | AUTHORIZED DISTRIBUTOR FALSELY LISTED ON THE PEDIGREE | AMOUNT ($) |
|---|---|---|---|---|---|
| 3 | 12/14/08 | 1388 | CPS | McKesson | 274,236.06 |

| 4 | 06/18/09 | 1416 | Infinite | McKesson | 476,241.15 |
|---|---|---|---|---|---|
| 5 | 06/18/09 | 1416b | Infinite | McKesson | 123,621.19 |
| 6 | 04/02/10 | 1460 | Global | McKesson | 1,137,605.80 |
| 7 | 06/02/10 | 1468 | Global | McKesson | 1,101,383.09 |
| 8 | 11/09/10 | 1481 | Global | McKesson | 1,857,901.75 |

Each count constituting a separate and distinct violation of 18 U.S.C. §1341.

### Count 9 (RTL)
### Conspiracy
### Mail and Wire Fraud
### 18 U.S.C. §1349

80.     Paragraphs 1 through 25 and paragraph 27 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

81.     Beginning on or about July 2007 and continuing through about January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this court,

**[1]MARTIN THUNA,**
**[4]EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[10]MIKHAIL KEMEL,**
**[11]JOSEPH DALLAL,**
**[12] OLEG FACTOR,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury to:

a.     Use private and commercial interstate carriers for the purpose of executing a scheme and artifice to defraud, and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341; and

23

b.     Use interstate wires in furtherance of a scheme to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, <u>United States Code</u>, Section 1343.

## OBJECT OF THE CONSPIRACY

82.     The object of the conspiracy was to use mails and wires to execute a scheme in which drugs of unknown origin were obtained from RTL in the diversion market, fraudulently reintroduced into the wholesale market through **[24] DDLV, [25] LLC WHOLESALE,** and **[26] DROGUERIA VILLA,** and sold under false pretenses to pharmacies and end users.

## MANNER AND MEANS

83.     The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

84.     CC-2, principal of RTL, operating from California under a Hawaii license, purchased diverted pharmaceuticals from individuals **[10] MIKHAIL KEMEL, [11] JOSEPH DALLAL,** and CC-3 acting on behalf of **[12] OLEG FACTOR.**

85.     CC-2 would first obtain offer sheets from his suppliers. After consolidating the supplier offer sheets into a single RTL offer, CC-2 would fax an offer to **[4] EUGENE SHIRLEY,** providing discounts of approximately 15% or more below WAC. Upon receiving the offers, **[4] EUGENE SHIRLEY** would communicate and consult with **[1] MARTIN THUNA** regarding the acquisition of drugs from RTL.

86.     **[24] DDLV,** through **[4] EUGENE SHIRLEY,** would then place an order with RTL. CC-2 would in turn place an order for those drugs with his suppliers and meet them at various locations to receive the pharmaceuticals and make payments in cash.

87.     Upon receiving the pharmaceuticals, CC-2 would inspect the drugs and ship them to **[24] DDLV** in Puerto Rico from a UPS Store in Orange County, California.  CC-2 would use RTL's Hawaii address on shipping records, pedigrees, and invoices even though it was known to **[1] MARTIN THUNA**, **[4] EUGENE SHIRLEY**, **[5] PEDRO TORRES**, **[24] DDLV** and **[25] LLC WHOLESALE** that CC-2 was operating from California.

88.     In addition, RTL's pedigrees falsely stated that the pharmaceuticals supplied to **[24] DDLV** came from the authorized distributors HD Smith and AmerisourceBergen, when in fact, neither RTL, **[10] MIKHAIL KEMEL**, **[11] JOSEPH DALLAL**, CC-3, nor **[12] OLEG FACTOR**, had obtained the pharmaceuticals from HD Smith or AmerisourceBergen.

89.     Once the pharmaceuticals arrived at **[24] DDLV**, **[5] PEDRO TORRES** would remove damaged and expired products that customers might report to authorities or return to **[24] DDLV**.  Drugs that failed inspection were listed on **[24] DDLV** discrepancy reports and sometimes returned to RTL at its California address.  Drugs that passed inspection were placed in inventory and sold to customers under false pretenses that they had come from authorized distributors.

90.     From on or around August 2007 through on or around January 2011, **[24] DDLV** and **[25] LLC WHOLESALE** purchased approximately $90,975,933 in pharmaceuticals from RTL.  These payments to RTL were made from **[24] DDLV**, **[25] LLC WHOLESALE**, **[26] DROGUERIA VILLA,** and FMC Specialty Care through wire transfers and checks.  All the payments were deposited into RTL's bank accounts.

91.     During this time, RTL through CC-2 paid his suppliers approximately $77,000,000 in cash, drawn from the RTL account.  The amount in cash paid to the suppliers for the diverted pharmaceuticals was approximately $28,505,123.50 to **[10] MIKHAIL KEMEL;**

$19,486,411.20 to **[11] JOSEPH DALLAL**; and $28,824,222.23 to CC-3, who in turn, would pay **[12] OLEG FACTOR**.

OVERT ACTS

92.     In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the District of Puerto Rico, and elsewhere, at least one of the following overt acts, among others.

93.     On or about July 20, 2007, after being introduced to **[4] EUGENE SHIRLEY**, CC-2 faxed a copy of RTL's Hawaii license to **[24] DDLV** and **[25] LLC WHOLESALE**.

94.     On or about July 29, 2007, CC-2 on behalf of RTL transmitted an alternative source application and indemnity agreement to **[24] DDLV** and **[25] LLC WHOLESALE**, falsely listing his shipping address in Hawaii.

95.     On or about July 30, 2007, **[24] DDLV** received the first shipment of pharmaceuticals from RTL.  The shipment originated from Orange, California and consisted of 3 boxes sent via UPS and addressed to **[24] DDLV** in Puerto Rico.   Included in the shipment were RTL Invoice #300 and a pedigree falsely stating that RTL had purchased the pharmaceuticals from AmerisourceBergen.

96.     On or about August 3, 2007, **[1] MARTIN THUNA** initiated a wire transfer from **[24] DDLV**'s Citibank account ending in 7657 to RTL's Citizens bank account in the amount $227,716.86, for payment of Invoice #300.

97.     On or about October 1, 2007, **[5] PEDRO TORRES** returned pharmaceuticals to RTL in Orange County, California.  The package, according to the Return Packing Slip, contained pharmaceuticals which were rejected by **[24] DDLV** and belonged to Invoices 300 and 304.

98.     On or about July 15, 2008, RTL received a faxed offer sheet from CC-3 listing various pharmaceuticals **[12] OLEG FACTOR** had available for sale.

99.     On or about July 17, 2008, CC-3, on behalf of **[12] OLEG FACTOR**, delivered several boxes containing diverted pharmaceuticals to CC-2.  That same date, CC-2 or others acting under his direction delivered $306,000 in cash to CC-3, who provided it to **[12] OLEG FACTOR**.

100.     On or about July 17, 2008, RTL shipped the pharmaceuticals from a UPS Store in Orange County, California to **[24] DDLV** in Puerto Rico, under invoice number 408 in the amount $460,317.12.   Along with the invoice was a pedigree falsely stating that the pharmaceuticals had been purchased from HD Smith.

101.     On or about December 8, 2008, RTL received faxed offer sheets from CC-3, on behalf of **[12] OLEG FACTOR**, as well as offer sheets from **[11] JOSEPH DALLAL** and **[10] MIKHAIL KEMMEL**, listing various pharmaceuticals.

102.     On or about December 9, 2008, CC-2 and others acting under his directions met CC-3, **[11] JOSEPH DALLAL** and **[10] MIKHAIL KEMMEL**, at different locations in California to receive delivery of the pharmaceuticals.

103.     On or about December 11, 2008, RTL shipped the pharmaceuticals from a UPS Store in Orange, California, to **[24] DDLV** in Puerto Rico under invoice number 432 in the amount $385,093.76. The associated pedigree for this shipment falsely stated that the drugs were purchased by RTL from HD Smith on December 9, 2008, when in fact neither RTL, **[10] MIKHAIL KEMEL**, **[11] JOSEPH DALLAL**, CC-3, nor **[12] OLEG FACTOR**, had obtained the pharmaceuticals from HD Smith.

27

104.    On or about April 28, 2009, RTL received faxed offer sheets from CC-3 on behalf of **[12] OLEG FACTOR**, **[11] JOSEPH DALLAL**, and **[10] MIKHAIL KEMEL**, listing various pharmaceuticals obtained from unknown sources.

105.    After receiving the pharmaceuticals, on or about April 30, 2009, RTL caused the individual suppliers to be paid in cash.

106.    On or about May 1, 2009, RTL shipped the pharmaceuticals from a UPS Store in Orange, California to **[24] DDLV** in Puerto Rico under invoice number 717 in the amount $921,149.56. The associated pedigree for this shipment falsely stated that the drugs were purchased by RTL from HD Smith on April 30, 2009, when in fact neither RTL, **[10] MIKHAIL KEMEL**, **[11] JOSEPH DALLAL**, CC-3, nor **[12] OLEG FACTOR**, had obtained the pharmaceuticals from HD Smith.

107.    On or about June 8, 2009, CC-2 shipped 9 boxes of diverted pharmaceuticals from Orange, California to **[24] DDLV** in Arecibo, PR.   The shipment was noted on RTL Invoice #721.   The associated pedigree included with the shipment falsely stated that CC-2 purchased the invoiced pharmaceuticals from HD Smith on June 5, 2009, when in fact neither RTL, **[10] MIKHAIL KEMEL**, **[11] JOSEPH DALLAL**, nor CC-3, had obtained the pharmaceuticals from HD Smith or AmerisourceBergen.

108.    On or about March 26, 2010, CC-2 received faxed offer sheets from CC-3 on behalf of **[12] OLEG FACTOR**, **[11] JOSEPH DALLAL**, and **[10] MIKHAIL KEMEL**, listing various pharmaceuticals the individuals had for sale.

109.    On or about April 1, 2010, CC-2 received pharmaceuticals from **[10] MIKHAIL KEMEL**, or an individual acting at his direction known to the Grand Jury, and provided him with $200,000 cash in exchange for the pharmaceuticals.

110.   On or about April 8, 2010, CC-2 received pharmaceuticals from CC-3 and provided him with approximately $300,000 in cash, that was subsequently delivered to **[12] OLEG FACTOR** in exchange for the pharmaceuticals.

111.   That same date, on or about April 8, 2010, CC-2 met with **[11] JOSEPH DALLAL** and provided him with approximately $200,000 in cash for partial payment of the pharmaceuticals provided to RTL.

112.   On or about April 8, 2010, CC-2, on behalf of RTL, shipped the pharmaceuticals from a UPS Store in Orange, CA to **[24] DDLV** in Puerto Rico under invoice number 3309 in the amount $2,527,448.61. The associated pedigree for this shipment falsely stated that the drugs were purchased by RTL from HD smith on April 1, 2010, when in fact, neither RTL, **[10] MIKHAIL KEMEL**, **[11] JOSEPH DALLAL**, CC-3, nor **[12] OLEG FACTOR**, had obtained the pharmaceuticals from HD Smith.

113.   On or about June 15, 2010, CC-2 received a faxed offer sheet from CC-3 on behalf of **[12] OLEG FACTOR**, listing various pharmaceuticals that were available for sale.

114.   On or about June 25, 2010, CC-2 and others acting under his directions met CC-3, acting on behalf of **[12] OLEG FACTOR**, and received the pharmaceuticals and provided payment of $100,000 in cash for the pharmaceuticals.

115.   On or about June 30, 2010, RTL shipped the pharmaceuticals from a UPS Store in Orange, CA to **[24] DDLV** in Puerto Rico under invoice number 3320 in the amount $392,314.15. The associated pedigree for this shipment falsely stated that RTL purchased the pharmaceuticals from HD smith on June 25, 2010, when in fact, neither RTL, CC-3, nor **[12] OLEG FACTOR**, had obtained the pharmaceuticals from HD Smith or AmerisourceBergen.

## Count 10 (RTL GROUP)
### Conspiracy
### False Statements and Unlicensed Wholesale Distribution
### 18 U.S.C. § 371

116.    The allegations set forth in paragraphs 1 through 25 and paragraph 27 are incorporated by reference as if fully re-alleged herein.

117.    From in or around July 2007 through in or around January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

[1]MARTIN THUNA,
[4]EUGENE SHIRLEY,
[5] PEDRO TORRES,
[10]MIKHAIL KEMEL,
[11]JOSEPH DALLAL,
[12] OLEG FACTOR,
[24] DROGUERIA DE LA VILLA,
[25] LLC WHOLESALE, and
[26] DROGUERIA VILLA,

did willfully, that is, with the intent to further the conspiracy's unlawful objects, and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to:

a.      To violate Title 18, United States Code, Section 1001, by knowingly and willfully making and using a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States; and

b.      To violate Title 21 United States Code, Sections 331(t), 353(e)(2)(A), and 333(b)(1)(D) by knowingly engaging in, and causing other to engage, the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state.

OBJECT OF THE CONSPIRACY

118.    It was the object of the conspiracy to purchase, and to cause others to purchase, diverted pharmaceuticals from unlicensed sources in California and elsewhere, and for RTL to distribute those drugs without a license to **[24] DDLV** and **[25] LLC WHOLESALE**, and to falsify pedigrees associated with those pharmaceuticals.

MANNER AND MEANS

119.    The manner and means described in Count 9 of this Indictment is incorporated by reference and re-alleged here as the manner means of the conspiracy described in this count.

OVERT ACTS

120.    The overt acts described in Count 9 of this indictment are incorporated by reference and re-alleged as overt acts in the conspiracy described in this count.

All in violation of 18 U.S.C. §371.

**Counts 11 through 17 (RTL GROUP)**
**Mail fraud**
**18 U.S.C. § 1341**

121.    The allegation set forth in paragraphs 1 through 25, paragraph 27, and the manner and means set forth in Count 9 of the Indictment are incorporated by reference as if fully re-alleged herein.

122.    On or about the dates set forth below, each date constituting a separate count of the Indictment, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1]MARTIN THUNA,**
**[4]EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[10]MIKHAIL KEMEL,**
**[11]JOSEPH DALLAL,**
**[12] OLEG FACTOR,**
**[24] DROGUERIA DE LA VILLA,**

31

**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, along with others known and unknown to the Grand Jury, aiding and abetting

one another, having devised a scheme and artifice to defraud, and to obtain money and property

by means of materially false pretenses and representations, did, for the purpose of executing and

attempting to execute such scheme and artifice, cause to be deposited with, and to be sent by,

private and commercial interstate carriers, and knowingly caused to be delivered by such carriers

according to the direction thereon, the following drug shipments:

MAILINGS FROM SUPPLIERS TO [24] DDLV and [25] LLC WHOLESALE

| COUNT | APPROX. DATE OF MAILING | INVOICE NUMBER | SUPPLIER | AUTHORIZED DISTRIBUTOR FALSELY LISTED ON THE PEDIGREE | AMOUNT ($) |
|-------|-------------------------|----------------|----------|-------------------------------------------------------|------------|
| 11 | 12/11/08 | 432 | RTL | H.D. Smith | $385,093.76 |
| 12 | 05/04/09 | 717 | RTL | H.D. Smith | $912,780.45 |
| 13 | 10/22/09 | 741 | RTL | H.D. Smith | $630,977.97 |
| 14 | 01/11/10 | 3302 | RTL | H.D. Smith | $660,824.12 |
| 15 | 04/09/10 | 3309 | RTL | H.D. Smith | $2,604,081.30 |
| 16 | 05/19/10 | 3314 | RTL | H.D. Smith | $325,336.12 |
| 17 | 06/08/10 | 3317 | RTL | H.D. Smith | $1,614,442.18 |

Each count constituting a separate and distinct violation of 18 U.S.C. §1341.

### Count 18 (EMED GROUP)
### Conspiracy
### Mail and Wire Fraud
### 18 U.S.C. §1349

123.    The allegation set forth in paragraphs 1 through 25 and paragraph 28 are

incorporated by reference as if fully re-alleged herein.

124.    Beginning on or about January 2007 and continuing through on or around July

2009, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1]MARTIN THUNA,**
**[3] JARED THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[23] ERIC BAILEY,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other, with CC-4

and CC-5, and others known and unknown to the Grand Jury to:

        a.      Use private and commercial interstate carriers for the purpose of executing

a scheme and artifice to defraud, and for obtaining money by means of materially false and

fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code,

Section 1341; and

        b.      Use interstate wires in furtherance of a scheme to defraud, and to obtain

money by means of materially false and fraudulent pretenses, representations, and promises, in

violation of Title 18, United States Code, Section 1343.

## OBJECT OF THE CONSPIRACY

125.    The object of the conspiracy was to use mails and wires to execute a scheme in

which drugs of unknown origin were obtained from EMED in the diversion market, fraudulently

reintroduced into the wholesale market through **[24] DDLV** and **[25] LLC WHOLESALE**, and

sold under false pretenses to pharmacies and end users.

## MANNER AND MEANS

126.    The manner and means by which the defendants sought to accomplish the objects

and purpose of the conspiracy included, among others, the following:

127.   **[1] MARTIN THUNA, [3] JARED THUNA, [4] EUGENE SHIRLEY, [23] ERIC BAILEY**, and CC-4, used the name EMED Medical Products, Inc., a Missouri corporation with a pharmaceutical license in Missouri, to supply **[24] DDLV** and **[25] LLC WHOLESALE** with diverted pharmaceuticals with false pedigrees and provide the appearance that they were originating from authorized distributors, rather than unknown sources in California.

128.   In order to provide the appearance that **[24] DDLV** and **[25] LLC WHOLESALE** was dealing with a licensed company in Missouri, CC-4 would use EMED's Missouri license and address on shipping records, invoices, and pedigrees, but ship the products and accept returns at CC-4's location in California.

129.   At **[4] EUGENE SHIRLEY's** direction, CC-4 would falsely list AmerisourceBergen, McKesson, or Cardinal as the original source of pharmaceuticals sold by EMED to **[24] DDLV** and **[25] LLC WHOLESALE**, when in fact, EMED did not obtain the pharmaceuticals from authorized distributors.

130.   **[4] EUGENE SHIRLEY**, would assist EMED with the preparation of documents including a complete list of inventory being provided to **[24] DDLV** and **[25] LLC WHOLESALE**, which contained the lot numbers and expiration dates of the pharmaceuticals being accepted by **[24] DDLV** and **[25] LLC WHOLESALE**.

131.   **[4] EUGENE SHIRLEY**, referred a source to EMED, specifically CC-5.  CC-5 would also obtain pharmaceuticals from **[12] OLEG FACTOR**, and provide them to EMED.

132.   Once the pharmaceuticals arrived at **[24] DDLV** from EMED in California, **[5] PEDRO TORRES** would remove damaged, expired, and other pharmaceutical products that customers might report to authorities or return to **[24] DDLV**.  Drugs that failed inspection were

listed on **[24] DDLV** discrepancy reports and returned to EMED via UPS and FedEx to various California addresses.  Drugs that passed inspection at **[24] DDLV** were placed in inventory and eventually sold to **[24] DDLV**, **[25] LLC WHOLESALE** and **[26] DROGUERIA VILLA** customers under the false pretense that they had originated from authorized distributors.

133.    In Missouri, EMED's address was located in St. Louis, Missouri,  and EMED maintained Allegiant Bank Account number ending in 0301 (aka National City Bank Account 0301), in the name of  **[23] ERIC BAILEY**, d.b.a., E-Med Medical Products (hereafter EMED Missouri Account).

134.    In California, CC-4 operated from Los Angeles, California, and opened up Wells Fargo Account number ending in 5401 in the name of EMED Medical Products (hereafter EMED California Account).  In cases where **[24] DDLV** sent payments for pharmaceuticals to Missouri, **[23] ERIC BAILEY** would deposit them into the EMED Missouri Account and issue a check to CC-4 in California, less a fee for transferring payment.

## OVERT ACTS

135.    In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the District of Puerto Rico, and elsewhere, at least one of the following overt acts, among others.

136.    On or about January 1, 2007, **[1] MARTIN THUNA** suggested to CC-4 to change the name of his existing drug wholesale business, JP Wholesale, was listed on a "black list" of pharmaceuticals suppliers.

137.    On or about February 21, 2007, CC-4 incorporated EMED Medical Products, Inc., in the State of California, for the purpose of opening a bank account and doing business in

California, and initially unbeknownst to **[23] ERIC BAILEY**, used EMED's wholesale pharmaceutical license in Missouri.

138.    On or around February 2007, **[4] EUGENE SHIRLEY** provided CC-4 with a pedigree template and instructions on how to fill them out, including how to list the names of the authorized distributors and purported date that the pharmaceuticals were purchased.

139.    On or about February 25, 2007, **[24] DDLV** mailed check number ending in 0531, from its Citibank account number ending in 7657 for $55,590.07, to EMED Medical Products at its location in Missouri.

140.    On or about February 27, 2007, **[24] DDLV** mailed check number ending in 0533, from its Citibank account number ending in 7657 for $63,956.71 to EMED Medical Products, at its location in Missouri.

141.    On or about March 1, 2007, after **[24] DDLV** check numbers ending in 0531 and 0533 were deposited into the EMED Missouri Account, **[23] ERIC BAILEY** forwarded the funds received from **[24] DDLV** to CC-4 in California by issuing check number 1843 from the EMED Missouri Account in the amount of $114,546.78. This amount represented the payment provided by **[24] DDLV**, less $4,000 retained by **[23] ERIC BAILEY**.

142.    On or about March 25, 2007, **[24] DDLV** mailed check number ending in 0552, from its Citibank account number ending in 7657 for $213,489.58 to EMED Medical Products at its location in Missouri.

143.    On or about March 28, 2007, after **[24] DDLV** check number ending in 0552 was deposited into the EMED Missouri Account, **[23] ERIC BAILEY** forwarded the funds to CC-4 in California by issuing check number 1850 from the EMED Missouri Account in the amount of

36

$207,489.58. This amount represented the payment by **[24] DDLV**, less $6,000 retained by **[23] ERIC BAILEY**.

144.   On or around May 21, 2007, **[3] JARED THUNA** conducted a mock site inspection of the EMED facility in Missouri, however, the facility visited was a two-story house with a two-car garage, not the California location providing diverted pharmaceuticals **[24] DDLV**.

145.   On or around June 2007, **[1] MARTIN THUNA**, received a communication from CC-4 requesting payments for invoices and confirming that EMED's true sources of pharmaceuticals were not the authorized distributors listed in the pedigrees.  In order to provide an appearance of due diligence on the part of **[24] DDLV**, on or about June 11, 2007, July 7, 2007, **[3] JARED THUNA** sent letters to CC-4 at EMED's address in Missouri, requesting verification that the pharmaceuticals originated from the authorized distributors McKesson, AmerisourceBergen, and Cardinal.  Notwithstanding that no verification was provided, **[24] DDLV** and **[25] LLC WHOLESALE** continued to purchase and receive pharmaceuticals from EMED in California.

146.   On or about August 7, 2007, EMED shipped diverted pharmaceuticals including Advair, Nasonex, Diovan, Coreg, and Detrol, from a UPS Store in Los Angeles, California to **[24] DDLV** in Puerto Rico under invoice number FMC0569.  The total sales price to **[24] DDLV** was $75,962.22. The pedigree corresponding to this invoice falsely stated that EMED purchased the pharmaceuticals from "McKessen" (misspelling in original).  On or about August, 13, 2007, **[24] DDLV**, noted in a discrepancy report that some of the pharmaceuticals in the shipment contained pharmaceuticals with broken seals, that were expired, and were professional samples.

147.     On or about May 5, 2008, EMED shipped diverted pharmaceuticals including Advair, Aricept, Detrol, Cozaar, and Seroquel from a UPS Store in Los Angeles, California to **[24] DDLV** in Puerto Rico under invoice number FMC0796.  The total sales price to **[24] DDLV** was $107,049.95.   The pedigree corresponding to this invoice falsely stated that EMED purchased the pharmaceuticals from "McKessen" (misspelling in original).

148.     On or about May 27, 2008, in payment for invoices and pharmaceuticals provided by EMED, **[1] MARTIN THUNA** caused a wire transfer to be executed in the amount of $157,287.62, from **[24] DDLV** Citibank account number ending in 7657 to the EMED California Account.

149.     On or about March 24, 2009, EMED shipped diverted pharmaceuticals including Amitiza, Nasonex, Valtrex, Topamax, Zyprexa, and Vytorin, without a California license, from a UPS Store in Los Angeles, California, to **[24] DDLV** in Puerto Rico under invoice number FMC0881.  The total sales price to **[24] DDLV** was approximately $99,000.  The pedigree corresponding to this invoice falsely stated that EMED purchased the pharmaceuticals from "McKessen" (misspelling in original).

150.     On or about April 7, 2009, **[1] MARTIN THUNA** caused a wire transfer to be executed in the amount of $188,023.29 from **[24] DDLV** Citibank account number ending in 7657 to Saehan Bank account number ending in 7264 belonging to EMED Trading Corp., in California, in payment for invoices provided by EMED.

### Count 19 (EMED GROUP)
**Conspiracy**
**False Statements and Unlicensed Wholesale Distribution**
**18 U.S.C. § 371**

151.     The allegations set forth in paragraphs 1 through 25 and paragraph 28 are incorporated by reference as if fully re-alleged herein.

152.    Beginning on or about January 2007 and continuing through on or around July 2009, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1]MARTIN THUNA,**
**[3] JARED THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[23] ERIC BAILEY,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA, INC.,**

defendants herein, combined, conspired, confederated, and agreed with each other, with CC-4 and CC-5, and others known and unknown to the Grand Jury to:

a.    To violate Title 18, United States Code, Section 1001 by knowingly and willfully making and using a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States; and; and

b.    To violate Title 21 United States Code, Sections 331(t), 353(e)(2)(A), and 333(b)(1)(D), by knowingly engaging in, and causing other to engage, the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state.

OBJECT OF THE CONSPIRACY

153.    It was the object of the conspiracy to purchase, and to cause others to purchase, diverted pharmaceuticals from unlicensed sources in California and elsewhere, for EMED to distribute those drugs without a license to **[24] DDLV** and **[25] LLC WHOLESALE**, and to falsify pedigrees associated with those pharmaceuticals.

MANNER AND MEANS

154.    The manner and means described in Count 18 of this indictment is incorporated by reference and re-alleged here as the manner means of the conspiracy described in this count.

OVERT ACTS

155.    The overt acts described in Count 18 of this indictment are incorporated by reference and re-alleged as overt acts in the conspiracy described in this count.

156.    The substantive crimes alleged in Counts 20 through 27 which follow are further alleged as overt acts in furtherance of the conspiracy.

All in violation of 18 U.S.C. §371.

**Counts 20 through 27 (EMED GROUP)**
**Mail fraud**
**18 U.S.C. 1341**

157.    Paragraphs 1 through 25,  paragraph 28 and the manner and means alleged in Count 18 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

158.    On or about the dates set forth below, each date constituting a separate count of the Indictment, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1]MARTIN THUNA,**
**[3] JARED THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[23] ERIC BAILEY**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, along with others known and unknown to the grand jury, aiding and abetting one another, having devised a scheme and artifice to defraud, and to obtain money and property

40

by means of materially false pretenses and representations, did, for the purpose of executing and attempting to execute such scheme and artifice, cause to be deposited with, and to be sent by, private and commercial interstate carriers, and knowingly caused to be delivered by such carriers according to the direction thereon, the following drug shipments:

MAILINGS FROM SUPPLIERS TO [24] DDLV and [25] LLC WHOLESALE

| COUNT | APPROX. DATE OF MAILING | INVOICE NUMBER | SUPPLIER | AUTHORIZED DISTRIBUTOR FALSELY LISTED ON THE PEDIGREE | AMOUNT ($) |
|---|---|---|---|---|---|
| 20 | 12/17/07 | FMC0678 | EMED | Cardinal Health | $23,153.24 |
| 21 | 02/19/08 | FMC0727 | EMED | "McKessen" | $77,246.55 |
| 22 | 03/29/08 | FMC0766 | EMED | "McKessen" | $63,346.63 |
| 23 | 04/17/08 | FMC0783 | EMED | AmerisourceBergen | $97,582.31 |
| 24 | 05/19/08 | FMC0796 | EMED | "McKessen" | $107,049.95 |
| 25 | 07/22/08 | FMC0840 | EMED | "McKessen" | $78,398.33 |
| 26 | 11/17/08 | FMC0870 | EMED | "McKessen" | $91,810.41 |
| 27 | 03/24/09 | FMC0881 | EMED | "McKessen" | $99,670.51 |

Each count constituting a separate and distinct violation of 18 U.S.C. §1341.

### Count 28 (BOWX GROUP)
**Conspiracy**
**Mail and Wire Fraud**
**18 U.S.C. §1349**

159.    Paragraphs 1 through 25 and paragraph 29 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

160.    Beginning on or around August 2009 and continuing through on or around March 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1]MARTIN THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[9] DIMITRY ASHBEL,**
41

**[14] RUSLAN MISCHINSKY,**
**[15] MARAT SHAKHRAMANYAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury to:

        a.     Use private and commercial interstate carriers for the purpose of executing a scheme and artifice to defraud, and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341; and

        b.     Use interstate wires in furtherance of a scheme to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

## OBJECT OF THE CONSPIRACY

161.   The object of the conspiracy was to use mails and wires to execute a scheme in which drugs of unknown origin were obtained from EMED in the diversion market and fraudulently reintroduced into the wholesale market through **[24] DDLV, [25] LLC WHOLESALE, and [26] DROGUERIA VILLA,** and sold under false pretenses to pharmacies and end users.

## MANNER AND MEANS

162.   The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

163.   **[9] DIMITRY ASHBEL, [14] RUSLAN MISCHINSKY, [15] MARAT SHAKHRAMANYAN,** and another individual known to the Grand Jury, sold and distributed

diverted pharmaceuticals on behalf of BowxRx and OahuRx.  Although BowxRx was licensed in New Hampshire and OahuRx was licensed in Hawaii, both companies operated out of California and shipped diverted pharmaceuticals to **[24] DDLV** from a UPS Store in Los Angeles, California.

164.    **[14] RUSLAN MISCHINSKY** and **[15] MARAT SHAKHRAMANYAN** would deliver diverted pharmaceuticals at the UPS Store in Los Angeles, California for the purposes of sending them to **[24] DDLV** and accept returns there.

165.    **[9] DIMITRY ASHBEL** would receive orders and meet with **[4] GENE SHIRLEY** in connection with the sale of diverted pharmaceuticals on behalf of BowxRx and OahuRx.

166.    On the pedigrees accompanying the pharmaceuticals sold to **[24] DDLV**, OahuRx and BowxRx would falsely list AmerisourceBergen as the immediate source of pharmaceuticals sold by them to **[24] DDLV**.

167.    Once the pharmaceuticals arrived at **[24] DDLV**, **[5] PEDRO TORRES** would remove damaged, expired, and other pharmaceutical products that customers might report to authorities or return to **[24] DDLV**.  Pharmaceuticals that failed inspection were returned to OahuRx and BowxRx via UPS and FedEx to various California addresses.  Drugs that passed inspection at **[24] DDLV** were placed in inventory and eventually sold to **[24] DDLV** and **[25] LLC WHOLESALE** customers under the false pretense that they had originated from authorized distributors.

168.    **[1] MARTIN THUNA** would pay for the pharmaceuticals mailed by **[14] RUSLAN MISCHINSKY** and **[15] MARAT SHAKHRAMANYAN** through checks and/or wire transfer to California bank accounts.

OVERT ACTS

169.    In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the coconspirators committed and caused to be committed, in the District of Puerto Rico, and elsewhere, at least one of the following overt acts, among others.

170.    On or about August 10, 2009, **[14] RUSLAN MISCHINSKY**, acting as president and registered agent, incorporated BowxRx, Inc., in the state of New Hampshire.

171.    On August 26, 2009, **[14] RUSLAN MISCHINSKY**, acting as president and registered agent, incorporated BowxRx, Inc., in the state of California.

172.    On September 22, 2009, **[14] RUSLAN MISCHINSKY** obtained a pharmaceuticals wholesale license under the name BowxRx from the New Hampshire Board of Pharmacy.

173.    On or about December 17, 2009, **[14] RUSLAN MISCHINSKY** shipped diverted pharmaceuticals from California to **[24] DDLV** in Puerto Rico under invoice number R113 for BowxRx in the amount of $281,820.66.  The associated pedigree for this shipment falsely indicated that BowxRx purchased the pharmaceuticals from AmerisourceBergen on December 17, 2009.

174.    On or about December 29, 2009, **[15] MARAT SHAKHRAMANYAN** obtained a pharmaceutical wholesale license from the State of Hawaii Board of Pharmacy under the name Oahu RX, Inc, listing the address as 777 S. Hotel, Unit B, Honolulu, Hawaii.

175.    On January 8, 2010, **[14] RUSLAN MISCHINSKY**, on behalf of BowxRx shipped diverted pharmaceuticals from California to **[24] DDLV** in Puerto Rico under invoice R116 in the amount of $263,064.34.  The associated pedigree for this shipment falsely stated that

44

BowxRx purchased the pharmaceuticals from AmerisourceBergen on January 4, 2010, when in fact, neither BowxRx, **[9] DIMITRY ASHBEL**, nor **[14] RUSLAN MISCHINSKY**, had purchased the pharmaceuticals from AmerisourceBergen.

176.    On or about February 1, 2010, **[5] PEDRO TORRES** prepared and caused to be prepared a discrepancy report for invoice number R116. The report noted that included in the shipment of pharmaceuticals from BowxRx purportedly from AmerisourceBergen were two physician's samples of Advair that were returned to BowxRx.

177.    On or about February 8, 2010, **[14] RUSLAN MISCHINSKY**, on behalf of BowxRx shipped diverted pharmaceuticals from California to **[24] DDLV** in Puerto Rico under invoice number R123 in the amount of $250,103.97. The associated pedigree for this shipment falsely stated that BowxRx purchased the pharmaceuticals from AmerisourceBergen on February 25, 2010, when in fact, neither BowxRx, **[9] DIMITRY ASHBEL**, nor **[14] RUSLAN MISCHINSKY** had purchased the pharmaceuticals from AmerisourceBergen.

178.    On or about October 7, 2010, **[15] MARAT SHAKHRAMANYAN**, in his capacity as Secretary and Treasurer of OahuRx, opened bank account number ending in 6605 at Chase Bank, for the purpose of receiving payments from **[24] DDLV** and drafting checks that would be negotiated for cash, either directly or after being deposited into another account.

179.    On or about October 26, 2010, **[15] MARAT SHAKHRAMANYAN**, in his capacity as owner of OahuRx, opened bank account number ending in 8339 at Wells Fargo, for the purpose of receiving payments from **[24] DDLV** and drafting checks that would be negotiated for cash, either directly or after being deposited into another account.

180.    On or about November 11, 2010, **[15] MARAT SHAKHRAMANYAN**, on behalf of Oahu RX, shipped diverted pharmaceuticals from California to **[24] DDLV** or **[25]**

**LLC WHOLESALE** under invoice number S1003 in the amount of $72,360.63. The associated pedigree for this shipment falsely stated that OahuRx purchased the pharmaceuticals from AmerisourceBergen on October 29, 2010, when in fact, neither OahuRx, **[9] DIMITRY ASHBEL**, **[14] RUSLAN MISCHINSKY**, nor **[15] MARAT SHAKHRAMANYAN** purchased the pharmaceuticals from AmerisourceBergen.

181.  On or about December 17, 2010, **[15] MARAT SHAKHRAMANYAN**, on behalf of OahuRX shipped diverted pharmaceuticals including Abilify, Advair, Seroquel, and Zyprexa, from California to **[24] DDLV** or **[25] LLC WHOLESALE** under invoice number L1043 in the amount of $202,887.46. The associated pedigree for this shipment falsely stated that OahuRx purchased the pharmaceuticals from AmerisourceBergen on January 17, 2011 (in original), when in fact, neither OahuRx, **[9] DIMITRY ASHBEL**, **[14] RUSLAN MISCHINSKY**, nor **[15] MARAT SHAKHRAMANYAN** purchased the pharmaceuticals from AmerisourceBergen.

182.  On December 29, 2010, **[9] DIMITRY ASHBEL** and **[15] MARAT SHAKHRAMANYAN**, on behalf of OahuRx, shipped two boxes containing diverted pharmaceuticals including Abilify, Aciphex, Advair, Lipitor, Nasonex, Seroquel and Zyprexa, from California to **[24] DDLV** or **[25] LLC WHOLESALE** under invoice number S1016 in the amount of $208,920.50.  The associated pedigree for this shipment falsely stated that the drugs were purchased by OahuRX from AmerisourceBergen on November 23, 2010, when in fact, neither OahuRX, **[9] DIMITRY ASHBEL**, **[14] RUSLAN MISCHINSKY**, nor **[15] MARAT SHAKHRAMANYAN**, had obtained the pharmaceuticals from AmerisourceBergen.

183.    During the period of time from December 11, 2010 through March 11, 2011, **[24] DDLV** mailed Oahu Rx approximately $3,662,183.08 in checks for payment of the diverted pharmaceuticals provided to **[24] DDLV** and **[25] LLC WHOLESALE.**

**Count 29 (BowX GROUP)**
**Conspiracy**
**False Statements and Unlicensed Wholesale Distribution**
**18 U.S.C. 371**

184.    Paragraphs 1 through 25 and paragraphs 29 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

185.    Beginning on or around August 2009 and continuing through on or around March 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1]MARTIN THUNA,**
**[4] EUGENE SHIRLEY,**
**[5] PEDRO TORRES,**
**[9] DIMITRY ASHBEL,**
**[15] MARK SHERMAN,**
**[14] RUSLAN MISCHINSKY,**
**[15] MARAT SHAKHRAMANYAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE,** and
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury to:

a.      To violate Title 18, United States Code, Section 1001 by knowingly and willfully making and using a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States; and

47

b.      To violate Title 21 <u>United States Code</u>, Sections 331(t), 353(e)(2)(A), and 333(b)(1)(D) by knowingly engaging in, and causing other to engage,  the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state.

OBJECT OF THE CONSPIRACY

186.    It was the object of the conspiracy to purchase, and to cause others to purchase, diverted pharmaceuticals from unlicensed sources in California and elsewhere, for EMED to distribute those drugs without a license to **[24] DDLV** and **[25] LLC WHOLESALE,** and to falsify pedigrees associated with those pharmaceuticals.

MANNER AND MEANS

187.    The manner and means described in Count 28 of this indictment is incorporated by reference and re-alleged here as the manner means of the conspiracy described in this count.

OVERT ACTS

188.    The overt acts described in Count 28 of this indictment are incorporated by reference and re-alleged as overt acts in the conspiracy described in this count.

189.    The substantive crimes alleged in Counts 30 through 46 which follow are further alleged as overt acts in furtherance of the conspiracy.

**Counts 30 through 46 (BowX GROUP)**
**Mail fraud**
**18 U.S.C. 1341**

190.    The allegation set forth in paragraphs 1 through 25, paragraph 29 and the manner and means described in Count 28 are incorporated by reference as if fully re-alleged herein.

191.    On or about the dates set forth below, each date constituting a separate count of the Indictment, in the District of Puerto Rico and elsewhere,

**[1]MARTIN THUNA,**
**[4] EUGENE SHIRLEY,**

48

**[5] PEDRO TORRES,**
**[9] DIMITRY ASHBEL,**
**[14] RUSLAN MISCHINSKY,**
**[15] MARAT SHAKHRAMANYAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, along with others known and unknown to the grand jury, aiding and abetting

one another, having devised a scheme and artifice to defraud, and to obtain money and property

by means of materially false pretenses and representations, did, for the purpose of executing and

attempting to execute such scheme and artifice, cause to be deposited with, and to be sent by,

private and commercial interstate carriers, and knowingly caused to be delivered by such carriers

according to the direction thereon, the following drug shipments:

MAILINGS FROM SUPPLIERS TO [24] DDLV and [25] LLC WHOLESALE

| COUNT | APROX. DATE OF MAILING | INVOICE NUMBER | SUPPLIER | AUTHORIZED DISTRIBUTOR FALSELY LISTED ON THE PEDIGREE | AMOUNT ($) |
|---|---|---|---|---|---|
| 30 | 11/25/09 | R113 | BowxRx | AmerisourceBergen | $281,820.66 |
| 31 | 01/08/10 | R116 | BowxRx | AmerisourceBergen | $263,064.34 |
| 32 | 01/29/10 | R119 | BowxRx | AmerisourceBergen | $140,520.09 |
| 33 | 02/09/10 | R122 | BowxRx | AmerisourceBergen | $189,707.34 |
| 34 | 02/10/10 | R129 | BowxRx | AmerisourceBergen | $364,809.27 |
| 35 | 02/17/10 | R123 | BowxRx | AmerisourceBergen | $250,103.97 |
| 36 | 02/23/10 | R132 | BowxRx | AmerisourceBergen | $272,560.41 |
| 37 | 03/08/10 | R130 | BowxRx | AmerisourceBergen | $260,832.31 |
| 38 | 09/20/10 | R258 | BowxRx | AmerisourceBergen | $133,595.53 |
| 39 | 12/16/10 | R128 | BowxRx | AmerisourceBergen | $96,223.01 |
| 40 | 11/28/10 | S1006 | Oahu Rx | AmerisourceBergen | $82,218.70 |
| 41 | 12/06/10 | L1040 | Oahu Rx | AmerisourceBergen | $9,698.18 |
| 42 | 12/20/10 | L1041 | Oahu Rx | AmerisourceBergen | $61,730.97 |
| 43 | 12/20/10 | L1043 | Oahu Rx | AmerisourceBergen | $202,887.46 |
| 44 | 12/23/10 | S1012 | Oahu Rx | AmerisourceBergen | $85,664.46 |
| 45 | 12/29/10 | S1016 | Oahu Rx | AmerisourceBergen | $208,920.50 |
| 46 | 12/29/10 | S1017 | Oahu Rx | AmerisourceBergen | $110,457.67 |

Each count constituting a separate and distinct violation of 18 U.S.C. §1341.

**Count 47 (ARBUDOL GROUP)**
**Conspiracy**
**Mail and Wire Fraud**
**18 U.S.C. §1349**

192.    Paragraphs 1 through 25 and paragraph 30 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

193.    Beginning on or about March 2007 and continuing through about January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[3] JARED THUNA,**
**[5] PEDRO TORRES,**
**[17] AVROHOM SEIDE,**
**[18] MICHAEL WEISS,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury to:

a.    Use private and commercial interstate carriers for the purpose of executing a scheme and artifice to defraud, and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341; and

b.    Use interstate wires in furtherance of a scheme to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

50

OBJECT OF THE CONSPIRACY

194.     The object of the conspiracy was to use mails and wires to execute a scheme in which drugs of unknown origin were obtained from Arbudol, Columbus and Cimax in the diversion market, fraudulently reintroduced into the wholesale market through **[24] DDLV, [25] LLC WHOLESALE,** and **[26] DROGUERIA VILLA,** and sold under false pretenses to pharmacies and end users.

MANNER AND MEANS

195.     The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

196.     In order to supply **[24] DDLV** with diverted pharmaceuticals obtained from the east coast, **[1] MARTIN THUNA** and an individual known to the Grand Jury, utilized the ARBUDOL GROUP, specifically, Columbus, Arbudol and Cimax, to ship diverted pharmaceuticals to **[24] DDLV** in Puerto Rico from New York City, New York. Although the pharmaceuticals were shipped from a UPS store in New York, New York, none of these wholesalers were licensed in New York. Rather, Columbus Wholesale was licensed in Maryland and Arbudol and Cimax were licensed in Pennsylvania.

197.     Unlike other suppliers of **[24] DDLV** and **[25] LLC WHOLESALE, [1] MARTIN THUNA** personally and exclusively handled orders, communications and any issues with the ARBUDOL GROUP.

198.     Once the diverted pharmaceuticals arrived at **[24] DDLV, [5] PEDRO TORRES** would inspect the product to remove damaged and expired products that customers might report to authorities or return to **[24] DDLV.** Drugs that failed inspection were listed on discrepancy reports and returned to the ARBUDOL GROUP.

199. The pedigrees accompanying the diverted pharmaceuticals sent by the ARBUDOL GROUP falsely stated that they had been purchased from AmerisourceBergen, when in fact, neither Columbus, Arbudol, nor Cimax purchased pharmaceuticals from AmerisourceBergen or had any relationship with the company. Rather, the pharmaceuticals were obtained from unknown sources.

200. Up until on or around November 2010, **[5] PEDRO TORRES** would generate false pedigrees for Cimax to be included in the files of **[24] DDLV** and **[25] LLC WHOLESALE**.

201. **[1] MARTIN THUNA** would direct employees to issue checks from various **[24] DDLV** bank accounts payable to Columbus, Arbudol, and Cimax. Over $90 million dollars of these checks were directly cashed or deposited into their respective accounts and subsequently negotiated and cashed at check cashing businesses in Brooklyn, New York.

OVERT ACTS

202. In furtherance of the conspiracy and to accomplish its objects and purpose, at least one of the coconspirators committed and caused to be committed, in the District of Puerto Rico, and elsewhere, at least one of the following overt acts, among others:

203. On or about March 7, 2007, **[18] MICHAEL WEISS**, using the social security number of an individual known as M.R.G. and a false driver's license in the name of an individual known as C.G., for the purpose of concealing his connection with Columbus, opened an account number ending in 8743 at Apple Bank on behalf of Columbus, with an initial deposit of $200,000 in the form of a check from **[24] DDLV** payable to Columbus.

204.    Or about July 23, 2008, **[17] AVROHOM SEIDE**, opened bank account number ending in 5790 at JP Morgan Chase Bank on behalf of Columbus, with an initial deposit of $500, an account used for depositing checks received from **[24] DDLV** as payment for the pharmaceuticals provided.

205.    On or about August 6, 2008, **[24] DDLV**, received a shipment of diverted pharmaceuticals from Columbus, the shipment consisted of 49 boxes sent from a UPS Store located in New York City, New York. Included in the shipment was Columbus invoices 5051 thru 5065, totaling $3,283,394.16. The associated pedigrees for this shipment falsely stated that Columbus purchased the pharmaceuticals from AmerisourceBergen.

206.    On or about August 6, 2008, during a computer chat, **[1] MARTIN THUNA** and **[5] PEDRO TORRES** discussed the need to shake and refrigerate products from Columbus as a means to loosen them up and provide the impression that the pharmaceuticals had been properly stored and maintained.

207.    On or about August 6, 2008, **[5] PEDRO TORRES** prepared and/or caused to be prepared discrepancy reports for Columbus invoices 5051 thru 5056. The reports noted that the shipment included 81 bottles of pharmaceuticals that were damaged. Notwithstanding the damaged product, **[24] DDLV** and **[1] MARTIN THUNA** continued to purchase pharmaceuticals from Columbus.

208.    On or about September 10, 2008, **[24] DDLV**, through **[5] PEDRO TORRES**, received from Columbus a bottle of Norvir that was sliced open from the bottom and contained a different medication. Notwithstanding the sign of tampering, **[24] DDLV** and **[1] MARTIN THUNA** continued to purchase pharmaceuticals from Columbus.

209.    On or about October 7, 2008, Columbus shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 5250 in the amount of $239,827.77.   The associated pedigree for this shipment falsely stated that Columbus purchased the pharmaceuticals from AmerisourceBergen.

210.    On or about October 7, 2008, Columbus shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 5261 in the amount of $309,457.29.   The associated pedigree for this shipment falsely stated Columbus purchased the pharmaceuticals from AmerisourceBergen.

211.    On or about December 29, 2008, Columbus shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 5830 in the amount of $291,241.69.   The associated pedigree for this shipment falsely stated that Columbus purchased the pharmaceuticals from AmerisourceBergen.

212.    On or about January 26, 2009, **[1] MARTIN THUNA** informed **[5] PEDRO TORRES** that "Columbus is not going to have goods anymore,..will be sending you a new license on company that knew them".

213.    On or about January 28, 2009, **[1] MARTIN THUNA** sent a fax to **[5] PEDRO TORRES** with the information for Arbudol, the company set to replace Columbus, including Arbudol's Pennsylvania wholesale license.

214.    On or about January 31, 2009, **[24] DDLV** received its first shipment of diverted pharmaceuticals from Arbudol—27 boxes of prescription pharmaceuticals sent without a license from a UPS Store located in New York, New York.  Included with the shipment were Arbudol invoices.  The associated pedigrees for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

215.    On or about February 5, 2009, **[17] AVROHOM SEIDE**, in his capacity as president of Better Health Wholesale, Inc., d.b.a., Arbudol Corp., opened Bank of America account number ending in 7717 in the name of Better Health Wholesale, Inc., d.b.a. Arbudol Corp., for the purpose of receiving checks from **[24] DDLV**.

216.    On or about February 17, 2009, **[24] DDLV** received a shipment of diverted pharmaceuticals from Arbudol.  The shipment consisted of 32 boxes sent from a UPS Store located in New York, New York.  Included with the shipment were invoices 7748 thru 7556. The associated pedigrees for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

217.    On or about September 9, 2009, Arbudol shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 8545 in the amount of $170,681.22.   The associated pedigree for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

218.    On or about September 9, 2009, Arbudol shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 8546 in the amount of $168,037.07.   The associated pedigree for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

219.    On or about November 3, 2009, Arbudol shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 8661 in the amount of $119,425.57.   The associated pedigree for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

220.    On or about November 17, 2009, Arbudol shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 8680

in the amount of $277,021.44. The associated pedigree for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

221. On or about December 1, 2009, aware of a complaint from a customer that some bottles of Zyprexa coming from Arbudol contained the wrong dosage amount, **[24] DDLV** received and accepted a shipment of diverted pharmaceuticals from Arbudol, including approximately 782 bottles of Zyprexa. The accompanying pedigrees for this shipment falsely stated that Arbudol purchased the pharmaceuticals from AmerisourceBergen.

222. On or about January 26, 2010, **[17] AVROHOM SEIDE**, in his capacity as power of attorney, and an individual known to the Grand Jury, opened Signature Bank account number ending in 8242, in the name of Cimax Corp.

223. On or about March 24, 2010, **[17] AVROHOM SEIDE** opened a Citibank account number ending in 8106 in the name of Better Health Wholesale, Inc., d.b.a. Arbudol, Brooklyn, New York.

224. On or about January 28, 2010, **[17] AVROHOM SEIDE** opened Apple Bank account number ending in 3694, in the name of Silver Hamarot Change, Inc., Brooklyn, New York. On or about June 29, 2010, **[17] AVROHOM SEIDE** changed the name of the account adding the d/b/a "Arbudol Corporation".

225. On or about June 11, 2010, **[17] AVROHOM SEIDE**, in his capacity as President of Cimax, opened Bank of America account number ending in 6882, in the name of Cimax.

226. On or about September 3, 2010, Cimax shipped diverted pharmaceuticals from a UPS Store in New York, New York, to **[24] DDLV** in Puerto Rico under invoice number 2258 in

the amount of $371,452.42. The associated pedigree for this shipment falsely stated that Cimax purchased the pharmaceuticals from AmerisourceBergen.

227.    On or about September 16, 2010, Cimax shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 2001 in the amount of $420,200.96. The associated pedigree for this shipment falsely stated that Cimax purchased the pharmaceuticals from AmerisourceBergen.

228.    On or about November 11, 2010, **[1] MARTIN THUNA** instructed **[5] PEDRO TORRES**, to use a previous Arbudol pedigree for a shipment of Kaletra that had arrived from Cimax. Not only did the pedigree not correspond to the shipment, but neither Arbudol nor Cimax had purchased the pharmaceuticals from AmerisourceBergen, as listed in the pedigree.

229.    On or about December 7, 2010, Cimax shipped diverted pharmaceuticals from a UPS Store in New York, New York to **[24] DDLV** in Puerto Rico under invoice number 2303 in the amount of $385,520.74. The associated pedigree for this shipment falsely stated that Cimax purchased the drugs from AmerisourceBergen.

### Count 48 (ARBUDOL GROUP)
**Conspiracy**
**False Statements and Unlicensed Wholesale Distribution**
**18 U.S.C. § 371**

230.    The allegation set forth in paragraphs 1 through 25 and paragraph 30 are incorporated by reference as if fully re-alleged herein.

231.    Beginning on or about January 2007 and continuing through about January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this court,

**[1] MARTIN THUNA,**
**[3] JARED THUNA,**
**[5] PEDRO TORRES,**
**[17] AVROHOM SEIDE,**
**[18] MICHAEL WEISS,**

57

**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

defendants herein, combined, conspired, confederated, and agreed with each other and others known and unknown to the Grand Jury to:

       a.      To violate Title18, United States Code, Sections1001, by knowingly and willfully making and using a false document, knowing such document to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the FDA, an agency within the executive branch of the United States; and

       b.      To violate Title 21, United States Code, Sections 331(t), 353(e)(2)(A), and 333(b)(1)(D) by knowingly engaging in, and causing other to engage, the wholesale distribution in interstate commerce of prescription drugs in a state without being licensed in that state.

## OBJECT OF THE CONSPIRACY

232.    It was the object of the conspiracy to purchase, and to cause others to purchase, diverted pharmaceuticals from unlicensed sources in New York and elsewhere, for Arbudol, Columbus and Cimax to distribute those drugs without a license to **[24] DROGUERIA DE LA VILLA** and **[25] LLC WHOLESALE**, and to falsify pedigrees associated with those pharmaceuticals.

## MANNER AND MEANS

233.    The manner and means described in Count 47 of this indictment is incorporated by reference and re-alleged here as the manner means of the conspiracy described in this count.

## OVERT ACTS

234.    The overt acts described in Count 47 of this indictment are incorporated by reference and re-alleged as overt acts in the conspiracy described in this count.

235.    The substantive crimes alleged in Counts 49 through 58 which follow are further alleged as overt acts in furtherance of the conspiracy.

All in violation of 18 U.S.C. §371.

### Counts 49 through 58 (ARBUDOL GROUP)
### Mail fraud
### 18 U.S.C. §1341

236.    The allegation set forth in paragraphs 1 through 25, paragraph 30, and the manner and means alleged in Count 47 of the Indictment are incorporated by reference as if fully re-alleged herein.

237.    On or about the dates set forth below, each date constituting a separate count of the Indictment, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[3] JARED THUNA,**
**[5] PEDRO TORRES,**
**[17] AVROHOM SEIDE,**
**[18] MICHAEL WEISS,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE,** and
**[26] DROGUERIA VILLA,**

defendants herein, along with others known and unknown to the grand jury, aiding and abetting one another, having devised a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses and representations, did, for the purpose of executing and attempting to execute such scheme and artifice, cause to be deposited with, and to be sent by, private and commercial interstate carriers, and knowingly caused to be delivered by such carriers according to the direction thereon, the following drug shipments:

59

MAILINGS FROM SUPPLIERS TO [24] DDLV and [25] LLC WHOLESALE

| COUNT | APPROX. DATE OF MAILING | INVOICE NUMBER | SUPPLIER | AUTHORIZED DISTRIBUTOR FALSELY LISTED ON THE PEDIGREE | AMOUNT ($) |
|---|---|---|---|---|---|
| 49 | 10/07/08 | 5250 | Columbus Wholesale | AmerisourceBergen | $239,827.77 |
| 50 | 10/07/08 | 5261 | Columbus Wholesale | AmerisourceBergen | $309,457.29 |
| 51 | 12/29/08 | 5830 | Columbus Wholesale | AmerisourceBergen | $291,241.69 |
| 52 | 09/09/09 | 8545 | Arbudol Corp. | AmerisourceBergen | $170,681.22 |
| 53 | 09/09/09 | 8546 | Arbudol Corp. | AmerisourceBergen | $168,037.07 |
| 54 | 11/03/09 | 8661 | Arbudol Corp. | AmerisourceBergen | $119,425.57 |
| 55 | 11/17/09 | 8680 | Arbudol Corp. | AmerisourceBergen | $277,021.44 |
| 56 | 09/16/10 | 2001 | Cimax | AmerisourceBergen | $420,200.96 |
| 57 | 11/03/10 | 2258 | Cimax | AmerisourceBergen | $371,452.42 |
| 58 | 12/07/10 | 2303 | Cimax | AmerisourceBergen | $385,520.74 |

Each count constituting a separate and distinct violation of 18 U.S.C. §1341.

**Count 59**
**Perjury**
**18 U.S.C. § 1623**

238.    On or about January 11, 2012, in the District of Puerto Rico and within the jurisdiction of this Court,

**[6] MIKHAIL ROZENBERG,**

defendant herein, knowingly submitted a false declaration under penalty of perjury to the Grand Jury for the District of Puerto Rico, in which he stated as follows: "I have never been an owner, officer, employee or a person who knowingly did business with" California Pharmaceutical

Specialists Wholesale, Inc; Global Health Advocates, or Infinite Health Wholesale. The aforesaid statement of **[6] MIKHAIL ROZENBERG**, as he then and there well knew and believed, was false in that **[6] MIKHAIL ROZENBERG**, was the owner.and controlling person of the aforesaid companies.  In violation of Title 18, United States Code, Section 1613.

### Count 60
### Money laundering conspiracy (ARBUDOL GROUP)
### 18 U.S.C. §1956(h)

239.    The allegations set forth in paragraphs 1 through 26, paragraph 30, and Counts 47 through 58 of this Indictment are incorporated by reference as if fully re-alleged herein.

240.    The Grand Jury further charges that, beginning in or around January 2007, and continuing up to and including on or around January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[16] SAMUEL ASHKENAZI,**
**[17] AVROHOM SEIDE,**
**[18] MICHAEL WEISS,**
**[19] JUDAH YABLONSKY,**
**[20] AARON ROTTENSTEIN,**
**[21] JACOB RICHTER, and**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE, and**
**[26] DROGUERIA VILLA,**

241.    defendants herein, and others known and unknown to the grand jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a.      to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United

States Code, Sections 1341 and 1343, with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

      b.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

      c.     to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, in violation of Title 18, United States Code, Section 1957.

OBJECT OF THE CONSPIRACY

242.　It was the object of the conspiracy for the conspirators to engage and attempt to engage in financial transactions involving proceeds from the sale of diverted pharmaceuticals by **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA**, to promote the purchase of additional diverted pharmaceuticals from unknown sources by suppliers doing business under the names Arbudol, Columbus and Cimax; and

243.　It was also the object of the conspiracy for the conspirators to engage and attempt to engage in financial transactions involving proceeds from the sale of diverted pharmaceuticals by **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA**, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, including the principals, beneficiaries and actual source of suppliers doing business under the names Arbudol, Cimax and Columbus;

MANNER AND MEANS

244.　The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

245.　It was part of the conspiracy that **[1] MARTIN THUNA** opened or caused to be opened bank accounts in the names of the various entities he controlled, including **[24] DDLV**, **[25] LLC WHOLESALE**, **[26] DROGUERIA VILLA**, and FMC Distributors of Nevada, used to deposit the proceeds obtained from the sale of diverted pharmaceuticals to chain and independent pharmacies throughout the Continental United States.　The accounts opened included **[24] DDLV** Citibank account number ending in 7657, **[25] LLC WHOLESALE** Citibank account number ending in 9709, and FMC Citibank account number ending in 5643.

246.    **[1] MARTIN THUNA**, the sole contact person with individuals known and unknown to the Grand Jury who controlled the ARBUDOL GROUP, would cause **[24] DDLV** in Puerto Rico to generate and mail checks and wire proceeds to Arbudol, Cimax and Columbus for the purpose concealing the identities of the individuals associated with and supplying the ARBUDOL GROUP, who in turn, would convert the payments to cash so as to secure additional pharmaceuticals from unknown sources to provide additional supply to **[24] DDLV** and **[25] LLC WHOLESALE**.

247.    Upon receipt of the funds provided in the form of wire transfer or checks to Arbudol, Cimax and Columbus, **[17] AVROHOM SEIDE** and **[16] SAMUEL ASHKENAZI**, would effectuate a series of financial transactions to convert the payments to cash for the purpose of concealing the ownership of the same and the individuals acquiring additional pharmaceuticals. This included withdrawing the proceeds in multiple financial transactions over $10,000 in the form of checks and cashier's checks that would be negotiated at various check cashing businesses, including Dependable Check Cashing,  Reliable Check Cashing, and Coney Island Payroll Services, located in Brooklyn, New York.

248.    To further conceal the individuals controlling the ARBUDOL GROUP, on or about March 7, 2007, **[18] MICHAEL WEISS**, used the social security number of an individual known was M.R.G. and a false driver's license in the name of an individual known as C.G., to open Columbus Apple Bank account number ending in 8743 using check number 4441152 for $200,000 from **[24] DDLV** Citibank account number ending in 7657 as the initial deposit.

249.    To further conceal and disguise the individual(s) who controlled the proceeds, **[19] JUDAH YABLONSKY**, Compliance Officer and Owner of Dependable Check Cashing, and **[20] AARON ROTTENSTEIN**, Manager and Owner of Reliable Check Cashing, and **[21]**

**JACOB RICHTER**, President of Coney Island Payroll Services, would file Currency Transactions Reports which failed to state the true identity of the individual negotiating the checks and would fail to keep records of the transactions as required by law.

250.    Transactions among the conspirators would be structured in the following manners, resulting in over $90 million dollars in proceeds from the sale of diverted pharmaceuticals in the form of checks being directly cashed or deposited into their respective accounts and subsequently negotiated and cashed at check cashing businesses in Brooklyn, New York:

a.    On or about February 25, 2009, **[26] LLC WHOLESALE** received two wire transfers from a customer to **[26] LLC WHOLESALE's** Citibank account number ending in 9709 in the amounts of $336,748.95 and $236,311.80 for the payment of diverted pharmaceuticals shipped from **[24] DDLV's** warehouse in Puerto Rico.  The next day, on or about February 26, 2009, **[1] MARTIN THUNA** transferred or caused to be transferred $626,206.59 from the **[26] LLC WHOLESALE** Citibank account number ending in 9709 into **[24] DDLV** Citibank account number ending in 7657.  Two days later, on or about February 28, 2009, check number 4441252, from **[24] DDLV** Citibank account number ending in 7657, payable to Columbus, was cashed at Dependable Check Cashing, in Brooklyn, New York by an individual unknown to the Grand Jury.   On or about March 2, 2009, **[19] JUDAH YABLONSKY**, Compliance Officer and Owner of Dependable Check Cashing executed a FinCen Form 104, Currency Transaction Report, falsely reporting that **[17] AVROHOM SEIDE** cashed check #4441152 and received $276,663.00 in cash, when in fact, it was an individual unknown to the Grand Jury.

b.      On or about March 17, 2009, check numbers 4441203 and 44401204 from **[24]** **DDLV** Citibank account number ending in 7657, payable to Arbudol in the amount of $145,067.56 and $162,273.41, respectively, consisting of proceeds of the sale of diverted pharmaceuticals to customers, were negotiated and cashed at Reliable Check Cashing, Brooklyn, New York by an individual unknown to the Grand Jury.   To further disguise the individuals connected with Arbudol, on or about March 26, 2009, **[20] AARON ROTTENSTEIN**, Manager and Owner of Reliable Check Cashing, signed and filed a FinCen Form 104, Currency Transaction Report, falsely reporting that **[17] AVROHOM SEIDE** received $302,117.00 in cash in exchange for the above mentioned checks, when in fact, it was another individual unknown to the Grand Jury.

c.      On or about April 17 and 20, 2009, two lock-box daily deposits of $175,428.57 and $188,917.49, respectively, from **[24] DDLV** customers were credited to FMC Citibank account number ending in 5643.   On or about April 20 and 21, 2009, **[1] MARTIN THUNA** transferred or caused to be transferred  $175,428.57 and $188,917.49, respectively, from FMC Citibank account number ending in 5643 to **[24] DDLV** Citibank account number ending in 7657.   On or about April 21, 2009, check number 4441249 from the **[24] DDLV** Citibank account number ending in 7657, payable to Arbudol in the amount of $281,336.25 was negotiated and cashed at Coney Island Payroll, Brooklyn, New York, by an individual unknown to the Grand Jury.   On or about April 21, 2009, **[21] JACOB RICHTER**, President of Coney Island Payroll Services, signed and filed a FinCen Form 104, Currency Transaction Report, falsely reporting that **[17] AVROHOM SEIDE** received $278,522.00 in cash in exchange for the above mentioned check, when in fact, it was cashed by an individual unknown to the Grand Jury.

d.      On or about December 23, 2009, [1] **MARTIN THUNA** caused checks from the [24] **DDLV** Citibank account number ending in 7657, payable to Arbudol Corp for invoices 8680 through 8692, to be issued with instructions to post-date the checks December 23 through December 30, 2009.  The checks, including check number 4441566 for $337,023.78, were sent via UPS from [24] **DDLV** in Puerto Rico to Arbudol at its address in Philadelphia, Pennsylvania. On or about December 28, 2009, an [25] **LLC WHOLESALE** customer transferred $1,435,965.82 into the [25] **LLC WHOLESALE** Citibank account number ending in 9709 for the payment of diverted pharmaceuticals shipped from [24] **DDLV** in Puerto Rico.  On or about December 29, 2009, [1] **MARTIN THUNA** transferred or caused to be transferred $506,385.93.59 from the [25] **LLC WHOLESALE** account number ending in 9709 into the [24] **DDLV** Citibank account number ending in 7657. After the money was transferred to cover the post-dated checks, on or about December 31, 2009, check #4441566 from the [24] **DDLV** Citibank account number 7657, payable to Arbudol in the amount of $337,023.78 was cashed by [16] **SAMUEL ASHKENAZI** at Reliable Check Cashing, in Brooklyn, New York.  The cash was provided to [16] **SAMUEL ASHKENAZI**, less the check cashing fee of approximately $3,337.00.

e.      On or about March 31, 2010, [1] **MARTIN THUNA** directed an employee known to the Grand Jury to pay Arbudol for invoices 8993 through 9005 with twelve post-dated checks post-dated April 9 through April 24, 2010.  The twelve check numbers 4441654 through 4441666, from [24] **DDLV** Citibank account number ending in 7657, totaling $4,011,771.42, were mailed from [24] **DDLV** in Puerto Rico to Arbudol at its Philadelphia, Pennsylvania address.  On or about April 9, 2010, [24] **DDLV** received a check in the amount of $2,856,116.26 from a customer that was deposited into the [24] **DDLV** Citibank account number

ending in 7657, as payment for diverted pharmaceuticals, a majority obtained from Arbudol and shipped from **[24] DDLV** in Puerto Rico.  On or about April 28, 2010, check number 4441664 from the **[24] DDLV** Citibank account number ending in 7657 in the amount of $323,018.47 was deposited into Arbudol Citibank account number ending in 8106.  Thereafter, on or about May 5, 2010, checks 9034 and 9035 from the Arbudol account were made payable to NY Central Services in the amounts of $80,000.00 and $128,876.00.  On or about May 5, 2010, **[16] SAMUEL ASHKENAZI**, cashed these two checks at Dependable Check Cashiers located in Brooklyn, New York.

All in violation of 18 U.S.C. §1956(h).

**Count 61**
**Money laundering conspiracy (ROZENBERG GROUP)**
**18 U.S.C. §1956(h)**

251.    The allegations set forth in paragraphs 1 through 26, paragraph 30, and Counts 47 through 58 of this Indictment are incorporated by reference as if fully re-alleged herein.

252.    The Grand Jury further charges that, beginning in or around January 2007, and continuing up to and including on or around January 2011, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court,

**[1] MARTIN THUNA,**
**[6] MIKHAIL ROZENBERG,**
**[7] LAWRENCE ROZENBERG,**
**[10] MIKHAIL KEMEL,**
**[13] SVYATOSLAV SHERMAN,**
**[22] ARARAT OVASAPYAN,**
**[24] DROGUERIA DE LA VILLA,**
**[25] LLC WHOLESALE,** and
**[26] DROGUERIA VILLA,**

defendants herein, and others known and unknown to the grand jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand

Jury to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a.      to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.      to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c.      to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified

unlawful activity, that is, mail fraud, wire fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1341 and 1343, in violation of Title 18, United States Code, Section 1957.

OBJECT OF THE CONSPIRACY

253. It was the object of the conspiracy for the conspirators to engage and attempt to engage in financial transactions involving proceeds from the sale of diverted pharmaceuticals by **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA**, to promote the additional purchase of additional diverted pharmaceuticals from unknown sources by suppliers doing business under the names Infinite, Global and CPS; and

254. It was also the object of the conspiracy for the conspirators to engage and attempt to engage in financial transactions involving proceeds from the sale of diverted pharmaceuticals by **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA**, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds, including the principals, beneficiaries and actual source of suppliers doing business under the names Infinite, Global, and CPS;

MANNER AND MEANS

255. The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

256. It was part of the conspiracy that **[1] MARTIN THUNA** opened or caused to be opened bank accounts in the names of the various entities he controlled, including **[24] DDLV**, **[25] LLC WHOLESALE, [26] DROGUERIA VILLA,** and FMC Distributors of Nevada, used to deposit the proceeds obtained from the sale of diverted pharmaceuticals to chain and independent pharmacies throughout the Continental United States. The accounts opened

70

included **[24] DDLV** Citibank account number ending in 7657, **[25] LLC WHOLESALE** Citibank account number ending in 9709, and FMC Citibank account number ending in 5643.

257.    **[1] MARTIN THUNA**, who had sole authority over the financial aspects of **[24] DDLV**, **[25] LLC WHOLESALE**, and **[26] DROGUERIA VILLA**, would direct employees at **[24] DDLV** in Puerto Rico to generate and mail checks as well as wire funds for the purpose of obtaining additional diverted pharmaceuticals and concealing the identities of **[6] MIKHAIL ROZENBERG** and **[7] LAWRENCE ROZENBERG** who were supplying the pharmaceuticals to **[24] DDLV** and **[25] LLC WHOLESALE**.

258.    Upon receipt of the funds provided in the form of wire transfer or checks, **[6] MIKHAIL ROZENBERG**, **[10] MIKHAIL KEMEL**, **[13] SVYATOSLAV SHERMAN**, **[22] ARARAT OVASAPYAN** and an individual known to the Grand Jury, would effectuate a series of financial transactions resulting in the converting of the payments to cash for the purpose of concealing the identity of **[6] MIKHAIL ROZENBERG** and acquiring additional pharmaceuticals from unknown sources. This included withdrawing the proceeds in multiple financial transactions over $10,000 in the form of checks and cashier's checks that would be negotiated at various check cashing businesses, including GS Financial Services, AAA Cash Advance, Cash Depot, One Stop Checking, Sarang Check Cashing, Joyro Check Cashing, Stasco Check Cashing, and Elite Check Cashing, all located in the Los Angeles area.

259.    In order to facilitate the payments and distribute the proceeds without revealing the true identity of the suppliers, the conspirators opened several accounts in the name of Infinite and Global.  On or about December 5, 2008, **[13] SVYATOSLAV SHERMAN** opened, as sole signatory, checking account number ending in 9497 at Union Bank in the name of Infinite Health Wholesales.  On or about November 9, 2009, **[10] MIKHAIL KEMEL** opened as sole signatory

checking account number ending in 9486 at Wells Fargo Bank in the name of Global.   To establish a further layer to conceal the transactions, on or about November 18, 2009, **[23] ARARAT OVASAPYAN** opened checking account ending in 6291 at US Bank in the name of **[23] ARARAT OVASAPYAN** dba Easy Solutions and Consulting.

260.   Transactions among the conspirators would be structured in the following manners, resulting in proceeds from the sale of diverted pharmaceuticals being deposited, transferred, and subsequently negotiated and cashed at check cashing businesses in California:

a.      On or about November 4, 2009, **[1] MARTIN THUNA** initiated a wire transfer of proceeds in the amount of $100,000 from the **[24] DDLV** Citibank account number ending in 7657, to the Infinite account number ending in 9497 at Union Bank.  After the proceeds were deposited to the Infinite account, on or about November 16, 2009, **[13] SVYATOSLAV SHERMAN** withdrew $25,750 from the account and purchased Cashier's Check # 0170002058 payable to Easy Solutions.   Later, on or about November 30, 2009, **[23] ARARAT OVASAPYAN** deposited the $25,750 check into the account number ending in 6291 at US Bank in the name of **[23] ARARAT OVASAPYAN** d/b/a Easy Solutions and Consulting.  After the deposit, **[23] ARARAT OVASAPYAN** drafted seven (7) checks ranging in amount from $2,000 to $6,500 that were all exchanged for cash.

b.      On or about May 21, 2010, **[1] MARTIN THUNA** initiated a wire transfer of proceeds in the amount of $151,075.95 from the **[24] DDLV** Citibank account number ending in 7657 to the Global Citibank account number ending in 8273. On or about May 25, 2010, **[10] MIKHAIL KEMEL** caused a wire transfer in the amount of $96,250.00 from this Global account to the **[23] ARARAT OVASAPYAN** dba Easy Solutions and Consulting US Bank account number ending in 6291.   These funds were then withdrawn via checks signed by **[23]**

ARARAT OVASAPYAN in odd dollar amounts, such as $2,352, $2,491, and $5,583 made payable to various individuals. Most of these checks were cashed at check cashing businesses set forth above.

     c.     On or about August 19, 2010, [1] MARTIN THUNA initiated a wire transfer of $150,000 in proceeds from the FMC Specialty Care Citibank account number ending in 1717 to the Global Citibank account number ending in 8273. On or about August 22, 2010, [10] MIKHAIL KEMEL transferred of $78,300 of these funds to the bank account of Starboard Marina for the purchase of a 2011 Chaparral boat that was negotiated by [7] LAWERENCE ROZENBERG and registered to [6] MIKHAIL ROZENBERG.

     d.     On or about October 5, 2010, [1] MARTIN THUNA initiated a wire transfer of $150,000 in proceeds from the FMC Specialty Care Citibank account number ending in 1717 to the Global account number ending in 9486. Five days later, on or about October 10, 2010, [10] MIKHAIL KEMEL signed check number 1439 in the amount of $10,083.54 from the Global account to Residential Elevators for the purchase and installation of an elevator in [6] MIKHAIL ROZENBERG's home in Lake Arrowhead, California.

     e.     On or about November 26, 2010, [1] MARTIN THUNA caused a transfer of $1,104,078.81 in proceeds from the [25] LLC WHOLESALE Citibank account number ending in 9709 into the [24] DDLV Citibank account number ending in 7657. Four days later, on or about November 29, 2010, [1] MARTIN THUNA initiated a wire transfer of $400,000 from the [24] DDLV Citibank account to the FMC Specialty Care Citibank account number ending in 1717. The same day, on or about November 29, 2010, [1] MARTIN THUNA initiated a wire transfer of $200,000.00 from this FMC Specialty Care account to the Global Citibank account number ending in 8273. After the transfer to Global on the same date, [10] MIKHAIL KEMEL

withdrew $27,500 from the Global account and purchased or caused to be purchased Citibank Official Check #311474397, payable to GS Financial Services, a check cashing facility.  From there, the check was provided to CC-6, who in turn, gave it to CC-7 for the purpose of cashing the check and returning the proceeds to CC-6.

All in violation of 18 U.S.C. §1956(h).

## FORFEITURE ALLEGATIONS

1.     The allegations contained in paragraphs 1 through 31 and Counts 1 through 58, 60 and 61 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (C),  Title 28, United States Code, Section 2461(c); and Title 18, United States Code, Section 982(a)(1), (4) and (7).

2.     Upon conviction of the offenses in violation of Title 18, United States Code, Section 1341 and conspiracy to violate Sections 1341 and 1343, the same set forth in 1, 3 through 9, 11 through 18, 20 through 28, 30 through 47, and 49 through 58 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

3.     Upon conviction of the offenses in violation of Title 18, United States Code, Section 1956 set forth in Counts 60 and 61 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(A) and Title 28, United States Code, Section 2461(c),and Title 18 United States Code, Section 982(a)(1) any property, real or personal involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956.

4.     Upon conviction of a conspiracy to violate Title 21, United States Code, Section 331, in violation of Title 18, United States Code, Section 371, alleged in Counts 2, 10, 19, 29, and 48 of this Indictment, pursuant to Title 18, United States Code, Sections 982(a)(7) and 24(a)(2), the defendants shall forfeit to the United States of

America any property, real or personal, which constitutes or is derived from proceeds traceable to any portion of the offenses that began on or after March 23, 2010.

5.    The property to be forfeited includes, but is not limited to, the following:

a.    MONEY JUDGMENT: A sum of money equal to the total amount of money involved in each offense, or conspiracy to commit such offense, for which the defendant is convicted, but not less than $649,854,151.00. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense

b.    Funds seized in the following accounts:

    i.    Banco Popular Account #395-028440, Drogueria De La Villa, Inc.
    ii.    Banco Popular Account #395-028431, FMC Distributors, Inc.
    iii.    Citizens Bank of Blount County Account # 62057, Drogueria Villa, Inc.
    iv.    Citibank Account # 500231857, Flar Medicine, Inc.
    v.    Citibank Account #500235650, FMC Distributors, Inc.
    vi.    Citibank Account #500235643, FMC Distributors, Inc.
    vii.    Citibank Account #500227657, FMC Distributors, Inc. dba Drogueria De La Villa
    viii.    Citibank Account #500239330, FMC Distributors, Inc. dba Drogueria De La Villa
    ix.    Citibank Account #500231717, FMC Specialty Care, Inc.
    x.    Citibank Account #500349709, LLC Wholesale Supply, LLC
    xi.    Citibank Account #500355086, LLC Wholesale Supply, LLC
    xii.    Citibank Account #151751567, Martin Thuna/Sonia Thuna
    xiii.    Citibank Account #500231782, Martin Thuna/Sonia Thuna
    xiv.    Citibank Account #202882445 T.P. Investments, Inc.
    xv.    Wells Fargo Bank Account #632-4195137, LLC Wholesale
    xvi.    Wells Fargo Bank Account #632-4195277, LLC Patient Services
    xvii.    Citibank Account #202640694, Rayco International LTD

c.    Real and personal property constituting proceeds of the offenses set forth above:

    i.    9809 Glenrock Drive, Las Vegas, Nevada
    ii.    2735 Desert Troon St, Las Vegas, NV4145 Wagon Trail Ave Las Vegas, NV
    iii.    9988 Keifer Valley Las Vegas, NV
    iv.    10639 Colter Bay Las Vegas, NV

     v.   10024 Bonterra Ave Las Vegas, NV
     vi.   2109 Bachelor Court Las Vegas, NV
     vii.   7720 Van Noord Ave Los Angeles, CA
     viii.   998 Nadelhorn Drive, Lake Arrowhead, CA
     ix.   Chaparral Boat, Vessel Identification Number FGBC0102F011, Mikhail
           Rozenberg.

6.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), Title 28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to the value of the amount described in paragraph 5 if, by any act or omission of the defendant, the property described in paragraphs 5, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intention of the United States, pursuant to Title 18, United States Code, Sections 982(b) to seek forfeiture of any other property of the defendants up to the value of the forfeitable property, as follows:

    a.   FMC Complex, El Tuque Industrial Park, Road 591, Lot 13, Ponce, PR
    b.   9027 Norma Place, West Hollywood, CA
    c.   8538 Eastwood Rd, Los Angeles, CA
    d.   911 Kings Rd N #217, West Hollywood, CA
    e.   602 E. Valerio St, Santa Barbara, CA
    f.   1509 Courtney Ave, Los Angeles, CA
    g.   10457 Troon Ave, Los Angeles, CA
    h.   8611 Burton Way #13, Los Angeles, CA
    i.   3008 W Balboa Blvd, Newport Beach, CA
    j.   8568 Burton Way # 308, Los Angeles, CA
    k.   4220 Longridge Ave, Studio City, CA
    l.   8325 Skyline Drive, Los Angeles CA
    m.   5212 Amestoy Ave, Encino, CA
    n.   3454 Green Vista Drive, Van Nuys, CA

All pursuant to Title 18, <u>United States Code</u>, Sections 981, 982; Title 21, <u>United States Code</u>, Section 853 (p); 28, <u>United States Code</u>, 2641(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.

/TRUE BILL/

FOREPERSON

Date: _Dic. 7, 12_

**ROSA EMILIA RODRÍGUEZ-VÉLEZ**
United States Attorney

José A. Ruiz
Chief, Criminal Division
Dated: 12/7/12

Ernesto López-Soltero
Unit Chief, White Collar Crimes Unit
Dated: 12/7/12

Charles R. Walsh
Assistant United States Attorney
Dated: 12/6/12

Joshua M. Eisen,
FDA Office of Chief Counsel
Special Assistant United States Attorney
Dated: 12/16/12